VINCENT J. DAVITT (State Bar No. 130649)
Email:  vdavitt@MDJAlaw.com
SHAUNT T. AREVIAN (State Bar No. 237698)
Email:  sarevian@MDJAlaw.com
**MEYLAN DAVITT JAIN AREVIAN & KIM LLP**
444 South Flower Street, Suite 1850
Los Angeles, California  90071
Telephone:  (213) 225-6000
Facsimile:  (213) 225-6660


Attorneys for Plaintiff
FT TRAVEL – NEW YORK, LLC,
d/b/a FROSCH TRAVEL

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FT TRAVEL-NEW YORK, LLC, d/b/a FROSCH TRAVEL,<br><br>              Plaintiff,<br><br>v.<br><br>YOUR TRAVEL CENTER, INC.; YTC TRAVEL, LLC; and COLIN WEATHERHEAD,<br><br>              Defendants. | CASE NO. 2:15-CV-1065<br><br>**COMPLAINT** |

Plaintiff FT TRAVEL – NEW YORK, LLC, d/b/a FROSCH TRAVEL ("FROSCH" or "Plaintiff"), by its undersigned counsel, alleges upon personal knowledge as to itself, and upon information and belief as to all other matters, the following:

## NATURE OF THE ACTION

1.      This action stems from Defendant Your Travel Center, Inc.'s breach of a valid, binding, and fully enforceable agreement with FROSCH, which caused FROSCH

1  to suffer significant damages and reputational harm for which it has no adequate remedy
2  at law.

3      2.      Accordingly, FROSCH seeks specific performance ordering Your Travel
4  Center, Inc. ("YTC") to perform its contractual obligations with FROSCH.
5  Alternatively, FROSCH seeks damages from YTC and its principal Colin Weatherhead
6  ("Mr. Weatherhead" or "Defendant Weatherhead") – who personally guaranteed YTC's
7  performance under the agreement with FROSCH – for YTC's breach of contract.

8  ## THE PARTIES

9      3.      Plaintiff FROSCH is a Delaware limited liability company that is co-
10 headquartered in New York, New York and Houston, Texas.  FROSCH's sole member
11 is a natural person who resides in Houston, Texas.

12     4.      Defendant YTC is a California corporation with its principal place of
13 business located in Santa Barbara, California.

14     5.      Upon information and belief, and as explained further below, Defendant
15 YTC Travel, LLC ("LLC") is a non-existent entity that is named as a Defendant in this
16 lawsuit out of an abundance of caution in case it exists as a separate legal entity.

17     6.      Defendant Weatherhead is a natural person who resides in Bend, Oregon,
18 and who also has a residence in Santa Barbara, California.  Mr. Weatherhead is YTC's
19 President and CEO.

20 ## JURISDICTION AND VENUE

21     7.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §
22 1332(a)(1) because the  matter in controversy exceeds the sum of $75,000, exclusive of
23 interest and costs, and is between citizens of different states.  Specifically, FROSCH is a
24 citizen of Texas, and upon information and belief, no Defendant is a citizen of Texas.

25     8.      Personal jurisdiction is proper in this Court pursuant to C.C.P. § 410 and
26 the Due Process Clause of the Constitution because Defendants have minimum contacts
27 with California sufficient to show that they have purposely availed themselves to the
28 laws of this forum.  As set forth further above and below, each of the Defendants has

substantial, continuous, and systematic contact with California subjecting them to personal jurisdiction in this Court.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because (i) a substantial part of the events giving rise to the claim occurred in this District, and (ii) each of the Defendants is subject to personal jurisdiction in this District.  Indeed, YTC's principal place of business is within this District and Mr. Weatherhead has a residence within this District.

**FACTUAL BACKGROUND**

**FROSCH's History and Extensive Growth**

10.     FROSCH is a travel management company founded more than 40 years ago that provides high-touch leisure and corporate travel services to individuals and companies by, among other things, selling air transportation.  FROSCH has been ranked as one of the top ten travel management companies in the country.

11.     In 1998, FROSCH's current President and CEO, Bryan Leibman, joined FROSCH with a vision to grow the company and continue delivering industry-leading expertise and travel services to its customers.

12.     Since Mr. Leibman joined FROSCH, the company has expanded by an average of 30% per year through internal growth and strategic acquisitions.  In the last 16 years, FROSCH grew from 30 employees to more than 1,400 in offices nationwide.

13.     As part of its growth plan, FROSCH looks for opportunities to acquire travel agencies and similar companies offering leisure or corporate travel services.

**FROSCH'S Relationship and Discussions With YTC to Acquire YTC's Business**

14.     In or around 2009, Mr. Leibman met Defendant Weatherhead, YTC's President and CEO.  Like FROSCH, YTC operates an independent retail travel agency selling air transportation and other travel services to clients.  Unlike FROSCH, YTC operates on a much smaller scale.  For example, upon information and belief, YTC primarily serves southern California and parts of Arizona, and maintains only approximately seven offices.

15.     Messrs. Leibman and Weatherhead developed a personal relationship and discussed business opportunities at various times over the last five years.  During several discussions, Mr. Weatherhead professed great admiration and respect for FROSCH's business model and Mr. Leibman's leadership, and made clear that he was interested in entering into a business relationship with FROSCH.

16.     Specifically, Messrs. Leibman and Weatherhead discussed a contractual arrangement whereby YTC would report all of its airline sales through a FROSCH "ARC"[1] branch office until Mr. Weatherhead decided he wanted to exit the travel management business and sell YTC.  At that time, FROSCH would acquire YTC at a contractually agreed-upon formula.

17.     In return for reporting its airline sales through a FROSCH ARC branch office and agreeing to be purchased by FROSCH, YTC was to receive, among other things, access to FROSCH's superior and vast network of service providers and preferred relationships, as well as benefit from FROSCH's operating and technological expertise.

18.     YTC would also receive significant cash payments and credits in the form of "commissions" and "overrides" from airline companies as a result of reporting its airline sales through FROSCH's ARC.  Specifically, airlines generally pay travel agencies both (i) "commissions" (i.e., an upfront payment based on a percentage of the price of the airline tickets sold); and (ii) "overrides" (i.e., backend payments or credits once travel agencies reach certain pre-determined goals of airline ticket sales sold through a particular ARC branch).

19.     The commissions and overrides that airlines pay travel agencies are generally tied to the volume of sales reported through a particular ARC branch.  Smaller travel agencies, like YTC, generally receive de minimis commissions and overrides

_____

[1] "ARC" stands for Airlines Reporting Corporation, an independent entity that serves as the clearing agent for travel agencies' sales of airline tickets.  Travel agencies, such as FROSCH, have ARC appointments through which they report their ticket sales and receive commissions and other payments from airlines.

1  because their sales are on a small scale.  Conversely, larger companies like FROSCH
2  receive significantly more commissions and overrides based on their increased volume
3  that they report through their ARCs.

4      20.    By reporting its airline sales through FROSCH's ARC, YTC would receive
5  the benefit of FROSCH's increased volume and receive dramatically more commissions
6  and overrides from airlines.

7      21.    During each of the parties' numerous discussions over the past five years
8  concerning their business relationship, Mr. Weatherhead was always clear that he
9  intended to transfer YTC's business to FROSCH, and that FROSCH would ultimately
10  acquire YTC's business.  The parties never discussed severing their business
11  relationship at any time.

12      22.    The parties were very close to entering into an agreement on these terms.
13  Indeed, Mr. Leibman traveled to YTC's Arizona office to meet with Mr. Weatherhead
14  and YTC's other shareholders, and Mr. Weatherhead traveled to FROSCH's Houston
15  office to further discuss the deal with Mr. Leibman.

16      23.    Notwithstanding the discussions between FROSCH and YTC, YTC entered
17  into an agreement with another travel management company – Tzell Travel, LLC
18  ("Tzell") – dated August 26, 2009 (the "Tzell Agreement").  Pursuant to the Tzell
19  Agreement, Tzell was obligated to establish a joint branch ARC office of YTC, known
20  as the "Tzell/YTC Branch," and YTC would report its airline and other travel services
21  sales through the Tzell/YTC Branch.

22  **YTC Enters Into a Valid, Binding, and Enforceable Agreement with FROSCH**

23      24.    In or around November 2014, Messrs. Leibman and Weatherhead resumed
24  discussions concerning a business arrangement whereby YTC would transfer its
25  business to a FROSCH ARC branch office, and begin reporting all of its airline sales
26  through FROSCH's branch office.

27      25.    Again, during the discussions, the parties made clear and expressed their
28  intent that FROSCH would ultimately acquire YTC's business when Mr. Weatherhead

wanted to sell it.  Until that time, the parties made clear that they intended that YTC would continue reporting all of its airline sales through FROSCH's branch office.

26.     On or about November 23, 2014, FROSCH and YTC entered into a valid, binding, and fully enforceable agreement.  A true and correct copy of the FROSCH/YTC agreement (the "FROSCH Agreement") is attached as Exhibit 1.

27.     Each of their respective spouses executed the agreement as witnesses to their signatures.  Excited that the parties had finally entered into this long-anticipated agreement that would result in FROSCH acquiring YTC's business, Messrs. Weatherhead's and Leibman's spouses embraced after the agreement was executed.

28.     The FROSCH Agreement was collectively negotiated and drafted by Messrs. Leibman and Weatherhead.  In at least one instance, Robin Sanchez – YTC's COO – assisted Mr. Weatherhead by filling in the name of the YTC-related entity in the FROSCH Agreement before the parties signed it.

29.     Specifically, on October 21, 2014, Ms. Sanchez, acting on YTC's behalf, forwarded a draft of the FROSCH Agreement to Mr. Leibman after filling in "YTC Travel, LLC" as FROSCH's counterparty in the agreement.  Upon information and belief, Ms. Sanchez made an error when she mistakenly identified that entity (as defined above, LLC) as FROSCH's counterparty, as upon further information and belief, that entity does not exist.

30.     The correct legal name of the existing entity that the parties intended to be bound by and perform under the FROSCH Agreement is "Your Travel Center, Inc." (as defined above, YTC).  Indeed, the FROSCH Agreement states that "YTC Travel, LLC" has "an office at 414 South Mill Ave, Tempe, AZ 85281."  But there is no "YTC Travel, LLC" listed on Arizona's Secretary of State website or YTC's website.

31.     Instead, the only YTC-related entity that appears on both the Arizona Secretary of State website and YTC's website is "Your Travel Center, Inc."  And each website lists that entity's address as 414 South Mill Avenue, Tempe, Arizona 85281 –

the same address that appears in the FROSCH Agreement for FROSCH's counterparty.[2]

32.    As Messrs. Leibman and Weatherhead had discussed, the FROSCH Agreement reflects the parties' intent that YTC would report all of its airline sales through FROSCH's branch office until Mr. Weatherhead wanted to sell YTC, at which time, FROSCH would purchase YTC's business.

33.    Specifically, the FROSCH Agreement states that "YTC shall transfer all of its business to an ARC [Airlines Reporting Corporation] … branch office of FROSCH at the YTC location; and in this regard, shall process all its client requests for air transportation using ARC facilities contracted to FROSCH."  Ex. 1 at 1, second "whereas" clause.

34.    To enable YTC to report its airline and other travel services sales through a FROSCH branch office, FROSCH agreed to establish an ARC branch office at YTC's main location and transfer the address of FROSCH's ARC to that YTC office.  Once FROSCH transferred the address, YTC agreed to "begin reporting all of its airline sales through the FROSCH ARC."  Id. ¶ 1.

35.    The FROSCH Agreement further makes clear that YTC would continue reporting its airline sales through FROSCH's ARC branch office until Mr. Weatherhead wanted to sell YTC.  Indeed, the agreement contains a carefully negotiated and specifically delineated "Succession" paragraph that sets forth the process by which YTC is to sell itself to FROSCH.  Id. ¶ 9.

36.    First, the provision provides that if Mr. Weatherhead is no longer able to operate as YTC's CEO, FROSCH will (i) assume interim CEO responsibilities of YTC and work closely with YTC's senior management for a $100,000 annual fee; and (ii) "**have an option of first refusal to acquire all company shares**" (except those of YTC's COO, Robin Sanchez) at a set formula when Mr. Weatherhead's wife (Brenda

---

[2] The only other YTC-related entity of which FROSCH is aware is "Your Travel Center, LLC."  Upon information and belief, that entity is a California limited liability company that is not licensed to do business in Arizona and does not have an office in Arizona.

Weatherhead) decided to sell the business. *Id.* ¶ 9(A) (emphasis added). While the agreement provides for an "option of first refusal," Messrs. Weatherhead and Leibman always intended and expected that FROSCH would ultimately acquire YTC's business.

37.     Second, the FROSCH Agreement provides that if YTC's CFO (Jackie Jones) was no longer able to operate as YTC's CFO while Mr. Weatherhead was still running YTC, FROSCH would acquire Ms. Jones's shares at a set formula and assume responsibility for YTC's financial operations for a set annual fee. *Id.* ¶ 9(B). This further demonstrates the parties' intent that FROSCH would continue to acquire YTC's shares as they became available until Mr. Weatherhead ultimately decided to sell the business, at which point, FROSCH would buy the remaining shares.

38.     In connection with the agreement's "Succession" provision, Mr. Leibman specifically met and spoke with YTC's shareholders before the FROSCH Agreement was executed. In those discussions, each of YTC's shareholders agreed and confirmed that YTC would ultimately sell its business to FROSCH.

39.     The "Succession" provision also addresses the parties' termination of the FROSCH Agreement by allowing YTC to "terminate" the agreement only upon the occurrence of a specifically defined event. The agreement provides that, if Mr. Leibman is no longer able to serve as FROSCH's President and CEO, or if FROSCH changed ownership, "YTC will have an option to continue with this agreement or to terminate at any time thereafter merely by providing 30 days written notice." *Id.* ¶ 9(C).

40.     This provision further evidences the parties' intent that YTC would continue performing under the FROSCH Agreement as long as Mr. Leibman, who Mr. Weatherhead admired and respected, was in charge. Mr. Weatherhead's respect and admiration for Mr. Leibman further explains why Mr. Weatherhead agreed that FROSCH would ultimately purchase his business.

41.     As the parties intended, this is the only termination provision in the FROSCH Agreement, which the parties specifically negotiated. YTC was therefore required to continue performing under the agreement as long as Mr. Leibman was

1   running FROSCH, or until Mr. Weatherhead decided to sell YTC – a decision that was

2   entirely within YTC's control.

3        42.    Accordingly, the FROSCH Agreement specifically covers every

4   contingency, expressly provides for FROSCH's "succession" of YTC's business, and

5   explicitly provides for termination only if Mr. Leibman ceased to be FROSCH's

6   President and CEO or FROSCH changed ownership.

7        43.    In consideration for YTC's agreement, YTC was given access to

8   FROSCH's vast and superior service providers, preferred vendors, and support services

9   and technology.  *Id.* ¶¶ 4, 7.

10       44.    YTC also was to be paid commissions and overrides for its airline and

11  travel services sales reported through FROSCH's ARC branch office, which were

12  significantly higher than the commissions and overrides YTC would receive by

13  reporting sales through its own ARC branch.  *Id.* ¶ 2.

14       45.    FROSCH would likewise receive increased commissions and overrides in

15  two forms.  First, FROSCH would now receive a portion of the commissions and

16  overrides generated from YTC's sales reported through FROSCH's branch office.

17  Second, FROSCH's commissions and overrides – which are based on volume of sales

18  reported through its ARC appointments nationwide – would increase significantly as a

19  result of YTC reporting its sales through FROSCH's ARC branch office.

20       46.    FROSCH would also receive additional revenues as a result of YTC

21  reporting its hotel bookings through FROSCH's global distribution systems and

22  FROSCH providing certain administrative support services to YTC.  *Id.* ¶¶ 2(a), 7.

23       47.    Mr. Weatherhead, in his personal capacity, expressly guaranteed YTC's

24  performance under the FROSCH Agreement.  He also agreed to execute a personal

25  guarantee in the form attached as an exhibit to the FROSCH Agreement.  *Id.* ¶ 5.

26       48.    YTC also agreed to indemnify and hold FROSCH and its employees

27  harmless from any liabilities, damages, and expenses, including attorneys' fees and

28  costs, arising from "the negligent or wrongful act, error, or omission of YTC from their

1    failure to perform this Agreement." *Id.* ¶ 5.

2        49.    The parties also agreed that the FROSCH Agreement would be "governed

3    by and interpreted under the laws of the State of New York." *Id.* ¶ 11(g).

4    **YTC Terminates the Tzell Agreement**

5        50.    In an act that acknowledges that the FROSCH Agreement was a final,

6    valid, binding, and fully enforceable agreement under which YTC was required and

7    intended to perform, YTC provided notice to Tzell that it was terminating the Tzell

8    Agreement the day after YTC and FROSCH executed the FROSCH Agreement.

9    Specifically, YTC notified Tzell that it was terminating the Tzell Agreement within 30

10   days (i.e., by December, 24, 2014).

11       51.    As an accommodation to YTC, and to allow YTC's termination of the

12   Tzell Agreement to take effect, Messrs. Weatherhead and Leibman agreed after they

13   executed the FROSCH Agreement that YTC would start performing under the FROSCH

14   Agreement on January 5, 2015 – the first Monday after New Year's Day.

15       52.    FROSCH has performed its end of the bargain.  Specifically, FROSCH

16   took steps to plan for YTC's performance under the FROSCH Agreement.  Among

17   other steps, it informed its service providers, including major airlines, that YTC would

18   begin reporting its airline and other travel services sales through FROSCH's ARC

19   branch office, which would result in more volume reported through FROSCH's ARC

20   appointment.  Upon information and belief, in reliance upon FROSCH's

21   representations, FROSCH's service providers took affirmative steps to plan for and

22   accommodate the expected increased sales that would be reported through FROSCH's

23   ARC.

24       53.    Upon further information and belief, YTC's initial termination notice to

25   Tzell was well-received, and Tzell acknowledged and accepted the termination.  But

26   soon thereafter, Barry Liben, Tzell's CEO, engaged in a campaign to pressure, bully,

27   and intimidate Mr. Weatherhead by threatening to take all of his travel agents, and

28   warned that he would destroy Mr. Weatherhead personally and professionally if he

1  joined FROSCH.

2      54.    Upon further information and belief, upon hearing Mr. Liben's threats, Mr.

3  Weatherhead capitulated and attempted to unilaterally terminate the FROSCH

4  Agreement by sending an email to Mr. Leibman.  In the email, Mr. Weatherhead

5  admitted signing the agreement, but cited "certain issues from both a legal and business

6  perspective which have come to light over the past 48 hours" as the reason for his

7  unilateral termination.

8      55.    YTC's failure to perform and its termination of the FROSCH Agreement

9  breached the contract, which as described above, provides for termination only if Mr.

10  Leibman ceased to be FROSCH's President and CEO or if FROSCH's ownership

11  changed.   Neither circumstance has occurred.  Accordingly, YTC is obligated to

12  perform under the FROSCH Agreement by reporting its airlines' and other travel

13  services' sales through FROSCH's ARC branch office.

14      56.    By unilaterally purporting to terminate the FROSCH Agreement and

15  failing to perform its contractual obligations under that agreement, YTC breached the

16  FROSCH Agreement.

17                          **FIRST COUNT**

18      **(Breach of Contract Against YTC – Specific Performance)**

19      57.    FROSCH repeats the allegations set forth above in Paragraphs 1 through 56

20  herein.

21      58.    The FROSCH Agreement is a valid, binding, and fully enforceable contract

22  between FROSCH and YTC.

23      59.    FROSCH has performed its obligations under the contract and is ready,

24  willing, and able to complete any remaining obligations.

25      60.    YTC has not performed all of its obligations under the FROSCH

26  Agreement, and has reneged on its performance.  But it is able to fully perform.

27      61.    FROSCH has no adequate remedy at law for YTC's breach of the

28  agreement.  As described by YTC's website, YTC's business and affiliations with travel

1  management companies are "unique," and YTC has a long list of unique customers that

2  it developed over more than 40 years in the industry, which is constantly growing.  In

3  addition, YTC describes itself as "a full scale 100 Million dollar Travel Agency" that is

4  "one of the premier Host Travel Agencies" with "over 200 Independent Contractors."

5       62.    Moreover, if YTC fails to perform under the FROSCH Agreement,

6  FROSCH will suffer significant, unquantifiable damages in the form of reputational

7  harm and lack of credibility in the travel industry, which FROSCH has worked hard to

8  develop for over 40 years.  Specifically, based on YTC's execution of the FROSCH

9  Agreement, Mr. Leibman made representations to FROSCH's longtime service

10  providers, and those providers relied on those representations by taking steps to

11  accommodate the increased volume that FROSCH expected to be reported through its

12  ARC.

13       63.    Because no damages could compensate FROSCH for the loss of such a

14  unique business opportunity to acquire YTC's business, and because FROSCH will

15  suffer unquantifiable reputational harm, FROSCH seeks specific performance by YTC

16  of the FROSCH Agreement.

17                  **SECOND COUNT**

18         **(Breach of Contract Against YTC -- Damages)**

19       64.    FROSCH repeats the allegations set forth above in Paragraphs 1 through 56

20  herein.

21       65.    As an alternative to the First Count, if the Court does not grant FROSCH

22  specific performance and order YTC to perform under the FROSCH Agreement, YTC is

23  liable for breaching the FROSCH Agreement.

24       66.    The FROSCH Agreement is a valid, binding, and fully enforceable contract

25  between FROSCH and YTC.

26       67.    FROSCH performed its contractual obligations under the agreement.

27       68.    YTC breached the FROSCH Agreement by purporting to unilaterally

28  terminate the agreement in contravention of the termination provision and stating that it

1 would not perform its contractual obligations under the agreement.

2      69.    FROSCH has been damaged as a direct and proximate result of YTC's

3 breach.  First, FROSCH lost the ability to ultimately acquire YTC's business.  Second,

4 FROSCH lost the additional commissions and overrides it would have received from

5 YTC reporting its sales through FROSCH's ARC branch office.  Third, FROSCH lost

6 the additional revenues it would have received from YTC reporting its hotel bookings

7 through FROSCH's global distribution systems, as well as the revenues FROSCH

8 would have received from providing administrative support services to YTC. *Id.* ¶¶

9 2(a), 7.  Fourth, FROSCH will suffer reputational harm in the industry based on its

10 representations to its service providers regarding the increased volume of sales it

11 expected to be reported through its ARC branch office, on which those providers relied.

**THIRD COUNT**

**(Breach of Contract Against Mr. Weatherhead)**

14      70.    Plaintiffs repeat the allegations set forth above in Paragraphs 1 through 56

15 and 64 through 69 herein.

16      71.    As an alternative to the First Count, if the Court does not grant FROSCH

17 specific performance and order YTC to perform under the FROSCH Agreement, Mr.

18 Weatherhead is personally liable for YTC's breach of the FROSCH Agreement.

19      72.    Mr. Weatherhead personally guaranteed YTC's performance of its

20 obligations under the FROSCH Agreement, and expressly agreed to execute a separate

21 personal guarantee in a form attached as an exhibit to the FROSCH Agreement.

22      73.    As set forth above, YTC breached its contractual obligations under the

23 FROSCH Agreement by, among other things, refusing to perform and purporting to

24 unilaterally terminate that agreement, and FROSCH was damaged as a direct and

25 proximate result of YTC's breach.

26      74.    Mr. Weatherhead is, therefore, personally liable for YTC's breach.  Mr.

27 Weatherhead is also personally liable for failing to execute the separate guarantee

28 attached as a form to the FROSCH Agreement.

**FOURTH COUNT**

**(Reformation Against YTC)**

75.     FROSCH repeats the allegations set forth above in Paragraphs 1 through 74 herein.

76.     If the Court does not find that YTC is the correct, existing, legal entity that was the parties' intended counterparty to FROSCH under the FROSCH Agreement, the FROSCH Agreement should be reformed to reflect that YTC is FROSCH's counterparty to the FROSCH Agreement, and is bound by, and required to perform under, that agreement.

77.     First, the parties' inclusion of LLC instead of YTC as the counterparty to the FROSCH Agreement was based on a mutual mistake of fact that is material and goes to the foundation of the agreement – specifically, the identity of FROSCH's correct counterparty to the agreement.

78.     In negotiating the FROSCH Agreement, Messrs. Leibman and Weatherhead intended that YTC – upon information and belief, the only existing legal entity with an office located at the exact address listed in the FROSCH Agreement (414 South Mill Ave., Tempe, Arizona 85281) – would be FROSCH's counterparty to the agreement.

79.     When Ms. Sanchez included LLC as FROSCH's counterparty in the FROSCH Agreement, however, she mistakenly named the wrong entity.  Upon information and belief, that entity does not exist, is not registered with Arizona's secretary of state, and does not have an office in Tempe, Arizona.

80.     Similarly, Mr. Leibman was mistaken when he executed the FROSCH Agreement with the wrong counterparty included.

81.     Accordingly, both parties were mistaken when they executed the FROSCH Agreement, which identified the wrong YTC-related entity named as FROSCH's counterparty.

82.     To that end, unknown to Messrs. Leibman and Weatherhead, the final,

signed, FROSCH Agreement does not reflect the parties' intent to bind YTC, for YTC to perform under the agreement, and for FROSCH to ultimately purchase YTC. Messrs. Leibman and Weatherhead, on behalf of FROSCH and YTC, respectively, shared the same erroneous belief as to a material fact, and their acts of signing the FROSCH Agreement with the wrong YTC-related entity listed as FROSCH's counterparty do not accomplish their mutual intent to bind YTC.

83.     Alternatively, if Mr. Weatherhead was not mistaken when he executed the FROSCH Agreement on behalf of LLC – upon information and belief, a non-existent entity – the agreement still should be reformed because of FROSCH's unilateral mistake of a material fact (i.e., the correct legal entity's name) as a result of Mr. Weatherhead's and YTC's fraud in intentionally deceiving FROSCH into signing an agreement with a nonexistent entity.

84.     Acting on FROSCH's behalf, Mr. Leibman reasonably relied to his detriment on YTC's and Mr. Weatherhead's representations and omissions that LLC was the correct legal entity to be included as FROSCH's counterparty in the FROSCH Agreement.  Mr. Weatherhead made these representations and omissions when, among other times, he failed to notify Mr. Leibman that the wrong YTC-related entity was identified as FROSCH's counterparty during the negotiations, as well as when he executed the FROSCH Agreement on behalf of the wrong (and nonexistent) entity.

85.     Mr. Leibman intended that FROSCH's counterparty in the FROSCH Agreement would be YTC, the legal entity that operates YTC's travel management business that FROSCH contracted to ultimately acquire.  Specifically, the FROSCH Agreement (i) provides that "YTC" operates independent retail travel agencies; (ii) identifies "YTC" as having more than one office, including one located at 414 South Mill Avenue, Tempe, Arizona 85281; (iii) identifies Mr. and Mrs. Weatherhead and Ms. Jones (YTC's CFO) as "YTC" shareholders; and (iv) provides that "YTC" would report all of its airline sales through a FROSCH ARC branch office.  Upon information and belief, Your Travel Center, Inc. (YTC, as defined above) is the only YTC-related entity

that (i) operates independent retail travel agencies; (ii) has more than one office, including one located at 414 South Mill Avenue, Tempe, Arizona 85281; (iii) includes Mr. and Mrs. Weatherhead and Ms. Jones (YTC's CFO) as shareholders; and (iv) has any airline sales to report through a FROSCH ARC branch office.

86.     Because Mr. Leibman did not know the correct name of the proper legal entity, he reasonably relied on Mr. Weatherhead's representations and omissions to his detriment.

87.     Mr. Weatherhead, acting on YTC's behalf, fraudulently induced FROSCH to enter into the FROSCH Agreement that listed the incorrect YTC-related entity as its counterparty.  Upon information and belief, Mr. Weatherhead knew – or should have known – that the agreement identified the wrong YTC-related entity, and intentionally misrepresented or omitted the correct legal entity name to deceive FROSCH to induce it to enter into an agreement with a nonexistent entity.   Indeed, as YTC's President and owner since 1995, Mr. Weatherhead knew – or should have known – that the incorrect YTC-related entity's name was included in the agreement.

88.     The final FROSCH Agreement, therefore, does not properly express FROSCH's intent to bind and obligate YTC – the correct legal entity – to perform under the agreement.

89.     FROSCH has been damaged as a direct and proximate result of Mr. Weatherhead's and YTC's material misrepresentations and omissions that were intentionally made to deceive FROSCH, as the true and correct YTC-related entity with the assets, clients, and travel services business that the parties intended would perform and ultimately be acquired by FROSCH is not identified as FROSCH's counterparty in the FROSCH Agreement.

## FIFTH COUNT

### (Breach of Contract Against LLC)

90.     FROSCH repeats the allegations set forth above in Paragraphs 1 through 56 herein.

91.    As an alternative to the First through Fourth Counts, if the Court finds that LLC is a valid and existing legal entity and the correct legal entity that the parties intended to be FROSCH's counterparty under the FROSCH Agreement, LLC is liable for breaching the FROSCH Agreement.

92.    The FROSCH Agreement is a valid, binding, and fully enforceable contract between FROSCH and LLC.

93.    FROSCH performed its contractual obligations under the agreement.

94.    LLC breached the FROSCH agreement by purporting to unilaterally terminate the agreement in contravention of the termination provision and stating that it would not perform its contractual obligations under the agreement.

95.    FROSCH has been damaged as a direct and proximate result of LLC's breach.  First, FROSCH lost the ability to ultimately acquire LLC's business.  Second, FROSCH lost the significant, additional commissions and overrides it would have received from LLC reporting its sales through FROSCH's ARC.  Third, FROSCH lost the additional revenues it would have received from YTC reporting its hotel bookings through FROSCH's global distribution systems, as well as the revenues FROSCH would have received from providing administrative support services to YTC.  *Id.* ¶¶ 2(a), 7.  Fourth, FROSCH will suffer reputational harm in the industry based on its representations to its service providers regarding the increased volume on which those providers relied.

## SIXTH COUNT

### (Breach of Contract Against Mr. Weatherhead)

96.    FROSCH repeats the allegations set forth above in Paragraphs 1 through 56 and 90 through 95 herein.

97.    As an alternative to the First through Fourth Counts, if the Court finds that LLC is a valid and existing legal entity that is the correct legal entity that the parties intended to be FROSCH's counterparty under that agreement, Mr. Weatherhead is personally liable for breaching the FROSCH Agreement.

98.   Mr. Weatherhead personally guaranteed LLC's performance of its obligations under the FROSCH Agreement, and expressly agreed to execute a separate personal guarantee in a form attached as an exhibit to the FROSCH Agreement.

99.   As set forth above, LLC breached its contractual obligations under the FROSCH Agreement by, among other things, refusing to perform and purporting to unilaterally terminate that agreement, and FROSCH was damaged as a direct and proximate result of LLC's breach.

100.   Mr. Weatherhead is, therefore, personally liable for LLC's breach.  Mr. Weatherhead is also personally liable for failing to execute the separate guarantee attached as a form to the FROSCH Agreement.

## SEVENTH COUNT

### (Breach of Contract Against Mr. Weatherhead)

101.   FROSCH repeats the allegations set forth above in Paragraphs 1 through 56 herein.

102.   As an alternative to the First through Sixth Counts, if the Court finds that neither YTC nor LLC is bound by the FROSCH Agreement, Mr. Weatherhead is personally liable for breaching that agreement.

103.   Upon information and belief, LLC is a nonexistent entity, and Mr. Weatherhead knew that it was a nonexistent entity when he executed the FROSCH Agreement on its behalf.

104.   Accordingly, the FROSCH Agreement remains a valid, binding, and fully enforceable agreement between FROSCH and Mr. Weatherhead.

105.   Mr. Weatherhead breached his contractual obligations under the FROSCH Agreement by, among other things, refusing to perform and purporting to unilaterally terminate that agreement, and FROSCH was damaged as a direct and proximate result of Mr. Weatherhead's breach.

106.   Mr. Weatherhead is, therefore, personally liable for breaching the FROSCH Agreement.

WHEREFORE, FROSCH seeks the following relief:

A. On the First Count (specific performance), an Order from the Court requiring YTC to perform its contractual obligations under the FROSCH Agreement;

B. As an alternative to the First Count, on the Second Count, damages in an amount to be determined at trial against YTC, together with interest and all fees (including attorneys' fees), costs, and expenses in bringing and prosecuting this action;

C. As an alternative to the First Count, on the Third Count, damages in an amount to be determined at trial against Mr. Weatherhead in his personal capacity, together with interest and all fees (including attorneys' fees), costs, and expenses in bringing and prosecuting this action;

D. On the Fourth Count, an Order from the Court reforming the FROSCH Agreement to reflect that YTC is FROSCH's counterparty to the agreement, and as set forth above in the First Count, specific performance ordering YTC to perform its contractual obligations under the FROSCH Agreement.  Alternatively, as set forth above in the Second and Third Counts, damages in an amount to be determined at trial against YTC and Mr. Weatherhead in his personal capacity, together with interest and all fees (including attorneys' fees), costs, and expenses in bringing and prosecuting this action;

E. As an alternative to the First through Fourth Counts, on the Fifth Count, damages in an amount to be determined at trial against LLC, together with interest and all fees (including attorneys' fees), costs, and expenses in bringing and prosecuting this action;

F. As an alternative to the First through Fourth Counts, on the Sixth Count, damages in an amount to be determined at trial against Mr. Weatherhead in his individual capacity, together with interest and all fees (including

1    attorneys' fees), costs, and expenses in bringing and prosecuting this

2    action;

3    G.    As an alternative to the First through Sixth Counts, on the Seventh Count,

4    damages in an amount to be determined at trial against Mr. Weatherhead in

5    his personal capacity, together with interest and all fees (including

6    attorneys' fees), costs, and expenses in bringing and prosecuting this

7    action;

8    H.    Such other and further relief as this Court deems just and proper.

9

10   DATED:  February 13, 2015         MEYLAN DAVITT JAIN AREVIAN & KIM LLP

11                                     By:   /s/ Vincent J. Davitt

12                                           Vincent J. Davitt
                                             Shaunt T. Arevian
13                                           Attorneys for Plaintiff
                                             FT TRAVEL – NEW YORK, LLC
14                                           d/b/a FROSCH TRAVEL

15

16   Of Counsel

17   MURPHY & McGONIGLE, P.C.

18   Michael V. Rella

19   1185 Avenue of the Americas, 21st Floor
     New York, New York 10036

20   (212) 880-3973

21                        **REQUEST FOR JURY TRIAL**

22         Plaintiff hereby demands a jury trial.

23

24

25

26

27

28

MEYLAN DAVITT
JAIN AREVIAN & KIM LLP

1

2  DATED:   February 13, 2015       MEYLAN DAVITT JAIN AREVIAN & KIM LLP

3                                        By:   /s/ Vincent J. Davitt

4                                              Vincent J. Davitt
                                               Shaunt T. Arevian
5                                              Attorneys for Plaintiff
                                               FT TRAVEL – NEW YORK, LLC
6                                              d/b/a FROSCH TRAVEL

7

8  4834-4578-5889

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEYLAN DAVITT
JAIN AREVIAN & KIM LLP