MICHAEL V. RELLA (admitted *pro hac vice*)
Email: mrella@mmlawus.com
SOREN E. PACKER (admitted *pro hac vice*)
Email: spacker@mmlawus.com
**MURPHY & McGONIGLE, P.C.**
1185 Avenue of the Americas, 21st Floor
New York, New York 10036
Telephone: (212) 880-3999
Facsimile: (212) 880-3998

VINCENT J. DAVITT (State Bar No. 130649)
Email: vdavitt@MDJAlaw.com
SHAUNT T. AREVIAN (State Bar No. 237698)
Email: sarevian@MDJAlaw.com
**MEYLAN DAVITT JAIN AREVIAN & KIM LLP**
444 South Flower Street, Suite 1850
Los Angeles, California 90071
Telephone: (213) 225-6000
Facsimile: (213) 225-6660

Attorneys for Plaintiff
FT TRAVEL – NEW YORK, LLC, d/b/a FROSCH TRAVEL

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FT TRAVEL-NEW YORK, LLC, d/b/a FROSCH TRAVEL,<br><br>Plaintiff,<br><br>v.<br><br>YOUR TRAVEL CENTER, INC.; YTC TRAVEL, LLC; and COLIN WEATHERHEAD,<br><br>Defendants. | CASE NO. 2:15-CV-1065-MMM-MANx<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6)**<br><br>Date:   June 29, 2015<br>Time:   10:00 a.m.<br>Place:   Courtroom 780<br>          Los Angeles, Roybal Building |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

INTRODUCTION ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................ 3

    A.    FROSCH's Discussions With YTC to Acquire YTC's Business ................. 3

    B.    YTC Enters Into an Enforceable Agreement with FROSCH ....................... 3

    C.    A Non-Existent YTC Entity is Mistakenly Named as FROSCH's
        Counterparty in the Agreement ..................................................................... 4

    D.    The Agreement Contains All Material Terms ............................................... 5

        1. YTC Agrees to Report its Airline Sales through a FROSCH ARC and
        Ultimately Sell Itself to FROSCH…………….....………………………5

        2. The Agreement Includes a Sole Termination Provision....………………6

        3. The Agreement Includes Consideration……………….……………….6

        4. Mr. Weatherhead Personally Guaranteed YTC's Performance………....7

    E.    The Parties Take Steps to Perform Under the Agreement ............................ 7

    F.    Mr. Weatherhead Purports to Terminate the Agreement .............................. 8

    G.    FROSCH's Damages as a Result of Defendants' Breach .............................. 8

ARGUMENT ................................................................................................... 8

    I.    PLEADING STANDARD ........................................................................ 8

    II.    THE COMPLAINT ALLEGES THAT THE AGREEMENT IS VALID,
        BINDING, AND ENFORCEABLE ON DEFENDANTS ........................... 9

    III.    DEFENDANTS' ARGUMENTS AGAINST THE AGREEMENT FAIL
         AS A MATTER OF LAW ..................................................................... 11

        A.    YTC is Bound by the Agreement ..................................................... 11

        B.    The Agreement Does Not Lack "Material Terms"............................ 15

            1. The Supposed Lack of a Duration Provision is of No
            Significance because the Agreement Contains a Termination
            Provision…………….……………………………………………...15

            2. The Succession Provision is Not an Unenforceable "Agreement
            to Agree"…….…………………………………………………….16

MURPHY &
McGONIGLE, P.C.

C.    The Agreement Does Not Lack Consideration ................................... 19

D.    FROSCH Alleges Damages ................................................................ 20

IV.    DEFENDANTS' ARGUMENTS AGAINST MR. WEATHERHEAD'S LIABILITY FAIL AS A MATTER OF LAW ............................................ 21

CONCLUSION ............................................................................................................... 23

Murphy &
McGonigle, P.C.

*PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS*

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*A-1 Gen. Contracting Inc. v. River Market Commodities Inc.*,
   622 N.Y.S.2d 378 (3d Dep't 1995)...................................................................... 20

*Adjustrite Sys. Inc. v. GAB Bus. Servs., Inc.*,
   145 F.3d 543 (2d Cir. 1998) ............................................................................... 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................ 9, 20

*Assos Constr. Corp. v. 1141 Realty LLC*,
   993 N.Y.S.2d 23 (1st Dep't 2014)...................................................................... 11

*Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*,
   692 F.3d 42 (2d Cir. 2012) ................................................................................... 9

*Citibank, N.A. v. Morgan Stanley & Co. Intern., PLC*,
   724 F. Supp. 2d 407 (S.D.N.Y. 2010) ........................................................... 13, 14

*Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*,
   74 N.Y.2d 475 (1989) ......................................................................................... 17

*Consac Indus., Inc. v. LDZ Comercio Importacao E Exportacao LTDA*,
   No. 01-cv-3857, 2002 WL 31094855 (E.D.N.Y. Aug. 29, 2002)...................... 22

*Different Drummer LLC v. Nat'l Urban League, Inc.*,
   No. 11-cv-4982, 2012 WL 406907 (S.D.N.Y. Feb. 7, 2012) ............................ 10

*Dorsett-Felicielli, Inc. v. Cnty. of Clinton*,
   No. 04-cv-1141, 2011 WL 1097859 (N.D.N.Y. Mar. 22, 2011).................... 16

*EGW Temporaries, Inc. v. RLI Ins. Co.*,
   919 N.Y.S.2d 752 (4th Dep't 2011) .................................................................. 13

*Fed. Deposit Ins. Corp. v. Northwood Projects, Inc.*,
   407 N.Y.S.2d 424 (Sup. Ct. N.Y. Cnty. 1978) ................................................. 16

*Galanis v. The Harmonie Club of the City of N.Y.*,
   No. 13-cv-4344, 2014 WL 4928962 (S.D.N.Y. Oct. 2, 2014) ......................... 10

MURPHY &
MCGONIGLE, P.C.

*Gerard W. Purcell Assoc., Ltd. v. Royal Caribbean Cruise Line, Inc.*,
    No. 89-cv-7325, 1990 WL 106793 (S.D.N.Y. July 24, 1990) ...................................... 16

*Gould v. Board of Educ.*,
    81 N.Y.2d 446 (1993) ............................................................................................... 15

*Herbert H. Landy Ins. Agency, Inc. v. Navigators Mgmt. Co.*,
    No. 14-cv-6298, 2015 WL 170460 (S.D.N.Y. Jan. 13, 2015)......................................... 9

*Integrated Mktg. & Promotional Solutions, Inc. v. JEC Nutrition, LLC*,
    No. 06-cv-5640, 2006 WL 3627753 (S.D.N.Y. Dec. 12, 2006)................................... 9, 22

*Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*,
    52 N.Y.2d 105 (1981) ............................................................................................... 17

*Kolchins v. Evolution Markets*,
     -- N.Y.S.3d --, 2015 WL 1471621 (1st Dep't April 2, 2015).................................... 9, 10

*Kosher Provisions, Inc. v. Blue & White Food Prods. Corp.*,
    No. 04-cv-361, 2005 WL 1890039 (E.D.N.Y. Aug. 9, 2005)...................................... 16

*Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*,
    No. 13-cv-4650, 2015 WL 769573 (S.D.N.Y. Feb. 24, 2015) ..................................... 21

*Lehman Bros., Inc. v. Tutelar CIA Financiera, S.A.*,
    No. 95-cv-3772, 1997 WL 403463 (S.D.N.Y. July 17, 1997) ..................................... 22

*Nicholas Lab. Ltd. v. Almay, Inc.*,
    900 F.2d 19 (2d Cir. 1990) ....................................................................................... 15

*Omega Eng., Inc. v. Omega, S.A.*,
    432 F.3d 437 (2d Cir. 2005) ...................................................................................... 20

*Payroll Express Corp. v. The Aetna Casualty and Surety Co.*,
    659 F.2d 285 (2d Cir. 1981) ...................................................................................... 15

*R.P.I. Services, Inc. v. Eisenberg*,
    814 N.Y.S.2d 870 (1st Dep't 2006).................................................................... 9, 11, 12

*Ruso v. Morrison*,
    695 F. Supp. 2d 33 (S.D.N.Y. 2010) .......................................................................... 21

*Schmidt v. Magnetic Head Corp.*,
    468 N.Y.S.2d 649 (2 Dep't 1983)............................................................................... 15

MURPHY &
McGONIGLE, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Schron v. Troutman Sanders LLP*,
   20 N.Y.3d 430 (2013) ............................................................ 19, 20

*Shukla v. Sharma*,
   586 F.App'x 752 (2d Cir. 2014) ................................................ 18

*Spanierman Gallery, PSP v. Love*,
   320 F. Supp. 2d 108 (S.D.N.Y. 2004) ........................................ 12

*Thales Alenia Space France v. Thermo Funding Co., LLC*,
   959 F. Supp. 2d 459 (S.D.N.Y. 2013) ....................................... 9, 19

*Wang v. Int'l Bus. Mach. Corp.*,
   No. 11-cv-2992, 2014 WL 6645251 (S.D.N.Y. Oct. 7, 2014) ......................... 9

*Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*,
   178 F. Supp. 655 (S.D.N.Y. 1959) ............................................ 15

*Weiner v. McGraw-Hill, Inc.*,
   57 N.Y.2d 458 (1982) ........................................................ 19

Murphy &
McGonigle, P.C.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff FT TRAVEL – NEW YORK, LLC, d/b/a FROSCH TRAVEL ("FROSCH") and Defendant Your Travel Center, Inc. ("YTC") sell travel services to customers.  In November 2014, the parties finalized a long-anticipated agreement (the "Agreement", as defined below) whereby YTC agreed to report its airline sales through a FROSCH branch office and ultimately sell itself to FROSCH in return for receiving higher commissions and access to FROSCH's superior services.

The Defendants argue that the Agreement was "partially memorialized (but never fully or properly executed)".  The plain language of the Agreement, however, shows it is a finalized, fully integrated agreement with all material terms that **both parties signed**.  Indeed, the principals' spouses witnessed the execution of the Agreement and signed it as "witnesses" to the principals' signatures.  Moreover, after signing the Agreement, the parties immediately took steps to perform under its terms.  Specifically, YTC's principal told FROSCH's competitor, Tzell Travel, LLC ("Tzell"), that he was terminating YTC's separate contract with Tzell so that YTC could perform under the Agreement, the same agreement that Defendants now claim never existed.  It was not until Tzell bullied and threatened YTC that YTC purported to unilaterally terminate the Agreement.  FROSCH therefore brings this lawsuit to enforce the Agreement on the terms to which the parties agreed.

In attempting to escape their obligations under the Agreement, Defendants treat their motion to dismiss as a motion for summary judgment, improperly challenging the Complaint's well-pleaded factual allegations that courts accept as true at the motion to dismiss stage.  Defendants also ignore the plain terms of the Agreement that undermine their theory and advance arguments that are contrary to well-settled New York law.[1]

---

[1] New York law governs the Agreement.  (Complaint ("Compl.") ¶ 49).

First, Defendants argue that the Agreement is unenforceable because it was mistakenly signed on behalf of a non-existent entity "YTC Travel, LLC" ("LLC").  But controlling New York law provides that under virtually identical circumstances, the true counterparty that the parties intended to perform is bound by the Agreement.  In this case, that is YTC.  Indeed, Defendants do not dispute that they intended YTC (i.e., the only entity owning the business to be purchased) to be FROSCH's counterparty in the Agreement; nor could they, as YTC is the only entity that matches each description of "YTC" in the Agreement.

Second, Defendants argue that the Agreement is terminable at will because it contains no duration.  Under New York law, however, duration is not required when the agreement contains a termination provision.  It is undisputed that the Agreement contains a termination provision.

Third, Defendants argue that there was no consideration for the Agreement.  The plain language of the Agreement, however, describes the consideration in terms identical to those that New York courts consistently find appropriate and binding.

Finally, Defendants argue that FROSCH suffered no "real" damages because Defendants purported to terminate the Agreement days after signing it.  Here again, Defendants ignore the Complaint's well-pleaded factual allegations showing the significant damages FROSCH has suffered from Defendants' breach.  Moreover, New York law precludes a party that has a "change of heart" from escaping its contractual obligations.  Defendants' motion should, therefore, be denied.

## FACTUAL BACKGROUND

**A.     FROSCH's Discussions With YTC to Acquire YTC's Business**

FROSCH is a travel management company that provides travel services to individuals and companies by, among other things, selling air transportation.  (Compl. ¶ 10).  In or around 2009, FROSCH's President and CEO, Bryan Leibman, met Defendant Colin Weatherhead, YTC's President and CEO.  (*Id.* ¶ 14).  Like FROSCH, YTC operates a retail travel agency selling air transportation and other services.  (*Id.*). Unlike FROSCH, YTC operates on a much smaller scale.  (*Id.*).

Messrs. Leibman and Weatherhead developed a relationship and discussed business opportunities over the next five years.  (*Id.* ¶ 15).  During several discussions, Mr. Weatherhead professed great admiration for FROSCH's business model and Mr. Leibman's leadership, and said he was interested in entering into a business relationship with FROSCH whereby YTC would buy and report all of its airline sales through a FROSCH "ARC"[2] branch office until Mr. Weatherhead decided to sell YTC.  (*Id.* ¶ 16). At that time, FROSCH would acquire YTC.  (*Id.*).  During these discussions, Mr. Weatherhead was clear that he intended to sell YTC's business to FROSCH.  (*Id.* ¶ 21). The parties never discussed severing their business relationship at any time.  (*Id.*). While the discussions were pending, YTC entered into an agreement with FROSCH's competitor, Tzell, pursuant to which YTC began reporting its airline sales through a Tzell ARC branch office.  (*Id.* ¶ 23).

**B.     YTC Enters Into an Enforceable Agreement with FROSCH**

Around November 2014, Messrs. Leibman and Weatherhead resumed discussions concerning a business arrangement on the same terms they had previously discussed. (*Id.* ¶ 24).  On or about November 23, 2014, FROSCH and YTC entered into an

---

[2] "ARC" stands for Airlines Reporting Corporation, an independent entity that serves as the clearing agent for travel agencies' sales of airline tickets.  Travel agencies, such as FROSCH, have ARC appointments through which they report their ticket sales and receive commissions and other payments from airlines.  (*Id.* ¶ 16 n.1).

*PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS*

1   agreement (the "Agreement", attached to the Complaint as Exhibit 1).  (*Id.* ¶ 26).

2   Messrs. Leibman's and Weatherhead's spouses executed the Agreement as witnesses to

3   their respective signatures.  (*Id.* ¶ 27).  Excited that the parties had finally signed this

4   long-anticipated agreement that would result in FROSCH acquiring YTC, the spouses

5   embraced after the Agreement was executed.  (*Id.*).

6   **C.     A Non-Existent YTC Entity is Mistakenly Named**
          **as FROSCH's Counterparty in the Agreement**

7

8        Unbeknownst to Mr. Leibman until this action was filed, the Agreement

9   mistakenly listed the wrong counterparty to FROSCH.  (*Id.* ¶ 29).  Specifically, on

10  October 21, 2014, Robin Sanchez, YTC's Chief Operating Officer ("COO"), forwarded

11  a draft of the Agreement to Mr. Leibman after inserting "YTC Travel, LLC" (LLC) as

12  FROSCH's counterparty.  (*Id.*).  In fact, the name of the entity that the parties intended

13  to perform under the Agreement is "Your Travel Center, Inc." (YTC).  (*Id.* ¶ 30).

14  Defendants now acknowledge that LLC is a "non-existent counterparty".  (Defendants'

15  Moving Brief ("Br.") at 1).

16       The undisputed facts confirm that Mr. Weatherhead intended to bind YTC.

17  (Compl. ¶¶ 30-31, 77-88).  The Agreement (i) provides that "YTC" operates

18  independent retail travel agencies; (ii) identifies "YTC" as having more than one office,

19  including one located at 414 South Mill Avenue, Tempe, Arizona; (iii) identifies Mr.

20  and Mrs. Weatherhead and Ms. Jones (YTC's CFO) as "YTC" shareholders; and

21  (iv) provides that "YTC" would report all of its airline sales through a FROSCH ARC

22  branch office.  (*Id.* ¶ 85).  Only one entity satisfies each of these descriptions, including

23  maintaining its office at 414 South Mill Avenue, Tempe, Arizona – and that entity is

24  YTC.

25

26

27

28

**D.**     **The Agreement Contains All Material Terms**

### 1. YTC Agrees to Report its Airline Sales through a FROSCH ARC and Ultimately Sell Itself to FROSCH

The purpose and mechanics of the Agreement are set forth in paragraphs 1-4, 7, and 9 of the Agreement.  The parties agreed that YTC would continue reporting its airline sales through FROSCH's ARC branch office until Mr. Weatherhead wanted to sell YTC.  (*Id.* ¶ 35).  The parties further agreed that, when that time came, FROSCH would purchase YTC at a contractually agreed-upon formula.  (*Id.* ¶¶ 35-36).  And the parties even went so far as to spell out the process by which YTC is to sell itself to FROSCH (the "succession provision").  (*Id.*).

The succession provision provides that if Mr. Weatherhead is no longer able to operate as YTC's CEO and when Mr. Weatherhead's wife (Brenda Weatherhead) decides to sell the business, FROSCH will "have an option of first refusal to acquire all company shares" (except those of YTC's COO, Robin Sanchez) at a set formula.  (*Id.* ¶ 36).  Under the formula, the purchase price for YTC is five times YTC's earnings before interest, tax, and amortization ("EBITA") for the preceding twelve months (with an adjustment for Mr. Weatherhead's takeout).  (Compl., Ex. 1 ¶ 9(A)).  While the Agreement provides for an "option of first refusal," Messrs. Weatherhead and Leibman always intended that FROSCH would acquire YTC's business.  (Compl. ¶ 36).

Further demonstrating the parties' intent that FROSCH would continue to acquire YTC's shares as they became available until Mr. Weatherhead ultimately decided to sell the business to FROSCH, the Agreement also provides that, if YTC's CFO (Jackie Jones) is no longer able to operate as CFO while Mr. Weatherhead is still running YTC, FROSCH would acquire Ms. Jones's shares at a set formula and assume responsibility for YTC's financial operations for a set annual fee.  (*Id.* ¶ 37).

In connection with the Agreement's succession provision, Mr. Leibman met and spoke with YTC's shareholders (i.e., Mr. and Mrs. Weatherhead and Ms. Sanchez)

*PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS*

1  before the Agreement was executed, and they agreed and confirmed that YTC would

2  ultimately sell its business to FROSCH.  (*Id.* ¶ 38).[3]

### 2.  The Agreement Includes a Sole Termination Provision

4          The Agreement also addresses the parties' termination by providing that YTC

5  could "terminate" the Agreement only upon the occurrence of a defined event.  (*Id.* ¶

6  39).  Specifically, the Agreement provides that, if Mr. Leibman is no longer able to

7  serve as FROSCH's President and CEO, or if FROSCH changes ownership, "YTC will

8  have an option to continue with this agreement or to terminate at any time thereafter

9  merely by providing 30 days written notice."  (*Id.*).  This is the Agreement's only

10 termination provision.   (*Id.* ¶ 41).

### 3.  The Agreement Includes Consideration

12         The Agreement specifically states that it is "in consideration of the mutual

13 covenants and promises herein contained and other good and valuable consideration".

14 (Compl., Ex. 1 at 1 ("NOW, THEREFORE" clause)).  The Agreement also lists the

15 specific types of consideration in numerous paragraphs.  For example, in consideration

16 for YTC's agreement to report its airlines sales through a FROSCH ARC branch office

17 and ultimately sell itself to FROSCH, YTC would receive access to FROSCH's vast and

18 superior service providers, preferred vendors, support services and technology, and

19 computer reservation system ("CRS") contract.  (Compl. ¶ 43; Compl., Ex. 1 ¶ 2).  YTC

20 would also receive significant cash payments and credits in the form of "commissions"

21 and "overrides" from airline companies as a result of reporting its airline sales through

22 FROSCH's ARC that it otherwise would not have received.  (Compl. ¶¶ 18, 20).

23         Likewise, FROSCH would receive increased commissions and overrides in two

24 forms.  First, FROSCH would now obtain a portion of the commissions and overrides

25

26         [3] The Complaint alleges Mr. Leibman spoke with YTC's shareholders and "each"

27 agreed that YTC would sell itself to FROSCH.  (Compl. ¶ 38).  To the extent that Ms.
Jones was a shareholder, Mr. Leibman spoke with her about the terms of the Agreement,

28 although they did not specifically discuss the buyout.

-6-

1 | generated from YTC's sales reported through FROSCH's branch office.  (*Id.* ¶ 45).

2 | Second, FROSCH's commissions and overrides – which are based on volume of sales

3 | reported through its ARC appointments nationwide – would increase significantly as a

4 | result of YTC's reporting its sales through FROSCH's ARC branch office.  (*Id.*).

5 | FROSCH would also receive additional revenues (and other tangible and intangible

6 | benefits coming with this increased volume) as a result of YTC reporting its hotel

7 | bookings through FROSCH's global distribution systems, FROSCH providing certain

8 | administrative support services to YTC, and YTC's using FROSCH's CRS contract.

9 | (*Id.* ¶ 46; Compl., Ex. 1 ¶ 2).

### 4.  Mr. Weatherhead Personally Guaranteed YTC's Performance

11 |  Mr. Weatherhead, in his personal capacity, guaranteed YTC's performance of its

12 | obligations under the Agreement in a "Guaranty and Indemnity" paragraph in the

13 | Agreement.  (Compl. ¶ 47).  He also agreed to execute a separate personal guarantee in

14 | the form attached as an exhibit to the Agreement.  (*Id.*).

### E.  The Parties Take Steps to Perform Under the Agreement

16 |  After executing the Agreement, FROSCH took steps to plan for YTC's

17 | performance under the Agreement.  (*Id.* ¶ 52).  Among other steps, FROSCH informed

18 | its service providers, including major airlines and CRS contract partners, that YTC

19 | would begin reporting its airline and other travel services sales through FROSCH's

20 | ARC branch office, which would result in more volume reported through FROSCH's

21 | ARC appointment.  (*Id.*).

22 |  YTC also took steps to perform under the Agreement.  The day after Messrs.

23 | Leibman and Weatherhead executed the Agreement, YTC notified Tzell that it was

24 | terminating the Tzell Agreement within 30 days (i.e., by December, 24, 2014) so that

25 | YTC could perform under the Agreement.  (*Id.* ¶¶ 50, 53).  To allow YTC's termination

26 | of the Tzell Agreement to take effect, Messrs. Weatherhead and Leibman agreed that

27 | YTC would start performing under the Agreement on January 5, 2015.  (*Id.* ¶ 51).

28 |

MURPHY &
MCGONIGLE, P.C.

1  Tzell initially acknowledged and accepted YTC's termination.  (*Id.* ¶ 53).  But

2  soon thereafter, Tzell's CEO engaged in a campaign to pressure, bully, and intimidate

3  Mr. Weatherhead by threatening to take his travel agents, and further warned that he

4  would destroy Mr. Weatherhead personally and professionally if he joined FROSCH.

5  (*Id.*).

6  **F.   Mr. Weatherhead Purports to Terminate the Agreement**

7      Mr. Weatherhead capitulated to the threats and attempted to terminate the

8  Agreement by sending an email to Mr. Leibman.  (*Id.* ¶ 54).  In the email, Mr.

9  Weatherhead admitted signing the Agreement, but cited "certain issues from both a

10  legal and business perspective which have come to light **over the past 48 hours**" as the

11  reason for his termination.  (*Id.*).  After sending the email to Mr. Leibman, Defendants

12  refused to perform their obligations under the Agreement.

13  **G.   FROSCH's Damages as a Result of Defendants' Breach[4]**

14      FROSCH has suffered significant damages from Defendants' actions.

15  Specifically, and as set forth in the Complaint, FROSCH lost (i) the ability to acquire

16  YTC's business, and the significant future profits from acquiring that business;

17  (ii) commissions and overrides from YTC's reporting its airline sales through

18  FROSCH's branch office; (iii) revenues from YTC's reporting its hotel bookings

19  through FROSCH's systems and from providing support services to YTC; and (iv)

20  revenues from YTC's using FROSCH's CRS contract.  (*Id.* ¶ 69).

21  **ARGUMENT**

22  **I.   PLEADING STANDARD**

23      In reviewing a motion to dismiss, the Court "accepts as true all well-pleaded

24  factual allegations and draws all reasonable inferences" in the plaintiff's favor.  *Herbert*

25  *H. Landy Ins. Agency, Inc. v. Navigators Mgmt. Co.*, No. 14-cv-6298, 2015 WL 170460,

26  ────────────────

27      [4] Two of FROSCH's claims are pleaded in the alternative based on LLC being a
valid and existing legal entity.  (Compl. ¶¶ 90-100).  Because Defendants now concede

28  LLC is a "non-existent counterparty" (Br. at 1), FROSCH withdraws those claims.

at *1 (S.D.N.Y. Jan. 13, 2015).[5]  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief", which occurs "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 679 (2009).  The Complaint satisfies this minimal pleading standard.

## II.   THE COMPLAINT ALLEGES THAT THE AGREEMENT IS VALID, BINDING, AND ENFORCEABLE ON DEFENDANTS

"[B]reach of contract claims fall under Rule 8(a), and thus require only a short and plain statement of the claim, so long as the facts alleged and any reasonable inferences that can be drawn in [plaintiff's] favor give rise to a plausible claim for relief."  *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 64 (2d Cir. 2012).  In light of this minimal standard, New York courts consistently deny motions to dismiss breach of contract claims.  *See, e.g., Thales Alenia Space France v. Thermo Funding Co., LLC*, 959 F. Supp. 2d 459, 466-67 (S.D.N.Y. 2013); *Integrated Mktg. & Promotional Solutions, Inc. v. JEC Nutrition, LLC*, No. 06-cv-5640, 2006 WL 3627753, at *4-7 (S.D.N.Y. Dec. 12, 2006); *R.P.I. Services, Inc. v. Eisenberg*, 814 N.Y.S.2d 870, 870 (1st Dep't 2006).

Indeed, just last month, New York's intermediate appellate court affirmed the denial of a breach of contract claim where the parties merely exchanged emails memorializing the terms of their agreement without ever signing a final, formalized contract.  *Kolchins v. Evolution Markets*, -- N.Y.S.3d --, 2015 WL 1471621, at *7-10 (1st Dep't April 2, 2015); *see also Wang v. Int'l Bus. Mach. Corp.*, No. 11-cv-2992, 2014 WL 6645251, at *4 (S.D.N.Y. Oct. 7, 2014) (granting motion to enforce the parties' preliminary memorandum of understanding even though the parties never executed a finalized, formal agreement); *Galanis v. The Harmonie Club of the City of*

---

[5] Unless stated otherwise, internal citations and quotations are omitted and emphasis is added.

*N.Y.*, No. 13-cv-4344, 2014 WL 4928962, at *7-12 (S.D.N.Y. Oct. 2, 2014) (granting motion to enforce oral agreement memorialized in an email even though the parties never executed a finalized, formal agreement).  Here, FROSCH's breach of contract claim stands on much firmer ground, as the claim is based on a final, formalized, and fully executed contract.

"To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."  *Kolchins,* -- N.Y.S.3d --, 2015 WL 1471621, at *7.  As discussed above, the Agreement is fully executed – reflecting an offer, acceptance, mutual assent, and an intent to be bound – and specifically provides for consideration.  (Background at 3-4, 6).  Further, the Agreement reflects the parties' material terms, i.e., YTC will report its airline sales through a FROSCH branch and sell itself to FROSCH in exchange for higher commissions and access to FROSCH's superior service providers.  (*Id.* at 4-7).

Courts also look to the parties' actions, and specifically, the actions of the party denying the contract.  *See, e.g., Different Drummer LLC v. Nat'l Urban League, Inc.*, No. 11-cv-4982, 2012 WL 406907, at *5 (S.D.N.Y. Feb. 7, 2012) (finding an enforceable contract based on defendant's email saying "let's move the ball forward" and holding that "manifestation of intent may take a number of forms, including by word, act or *conduct* which evinces the intention of the parties to the contract").  FROSCH alleges and Defendants do not dispute that Mr. Weatherhead (i) signed the Agreement, with his spouse witnessing his signature and further signing the Agreement as a witness; (ii) notified Tzell that he was terminating the Tzell Agreement immediately after signing the Agreement **so that YTC could perform under the Agreement** that he now argues never existed; and (iii) notified Mr. Leibman that YTC could not perform under the Agreement only after he was bullied and threatened by

1  Tzell's principal.  Simply put, Defendants' argument that the Agreement was only

2  "partially memorialized (but never fully or properly executed)" defies common sense.[6]

3  **III.   DEFENDANTS' ARGUMENTS AGAINST THE
4          AGREEMENT FAIL AS A MATTER OF LAW**

5          Defendants dispute that the Agreement is enforceable on four grounds:  (1) non-

6  existent LLC signed the Agreement, not YTC; (2) the Agreement lacks the "material

7  term" of duration and "represents an unenforceable 'agreement to agree'"; (3) there was

8  no consideration; and (4) FROSCH suffered no damages.  (Br. at 6).  Each of

9  Defendants' arguments is without merit.  Significantly, Defendants' arguments all

10  concern **what** the parties agreed to, not **whether** the parties ultimately agreed to

11  something.  The scope of the parties' Agreement, however, is the province of discovery

12  and motions for summary judgment, not a motion to dismiss.

13  **A.   YTC is Bound by the Agreement**

14          Defendants argue that the Agreement does not bind YTC because the YTC entity

15  that executed the contract was "YTC Travel, LLC" (LLC), a non-existent entity, not

16  Your Travel Center, Inc" (YTC).  (Br. at 6).  A defendant, however, may not dodge a

17  contract by arguing, after-the-fact, that it signed in the name of a non-existent entity.

18  Indeed, New York law consistently rejects so-called "misnomer" arguments.  *See*

19  *Eisenberg*, 814 N.Y.S.2d 870, 870 ("Plaintiff's use of an assumed name, albeit that of a

20  nonexistent corporation, in its [contracts] with the individual defendants … d[oes] not

21  vitiate such agreements."); *Assos Constr. Corp. v. 1141 Realty LLC*, 993 N.Y.S.2d 23,

22  24 (1st Dep't 2014) (affirming order enforcing judgment on plaintiff's breach of

23  contract claim where the defendant's manager signed the contract:  "a mere misnomer in

24  _____

25          [6] The fully executed Agreement also provides that (i) "FROSCH and YTC wish
26  to memorialize their agreement in writing" (Compl., Ex. 1 at 1 (third "WHEREAS"
    clause)), and (ii) it "represents the entire agreement between FROSCH and YTC",
27  "[t]here are no agreements or understandings concerning such Agreement, which are not
    fully set forth herein", and it "shall be binding upon an inure to the benefit of the heirs,
28  successors and assigns" (*id.* at ¶¶ 11(c), (e)).

1   the name of the corporate entity will not free it from liability under the contract.");

2   *Spanierman Gallery, PSP v. Love*, 320 F. Supp. 2d 108, 111 (S.D.N.Y. 2004) ("Under

3   New York law, a contract entered into by a corporation under a 'colloquial title' is

4   enforceable by either party, and 'the misnomer is held unimportant.").[7]

5          To identify the correct parties to a contract, courts look to the parties' intent, as

6   reflected in the language of the agreement and the surrounding circumstances. For

7   example, in *Spanierman*, the court held that "it is beyond dispute" that the entity in the

8   contract with the misnomer "was intended to designate" the existing defendant.

9   *Spanierman*, 320 F. Supp. at 112. The court further noted that "Plaintiffs have not

10  alleged that, at the time of the contract, they were under any actual misapprehension that

11  there was some other, unincorporated group with virtually the same name as [the actual

12  defendant]." *Id.*; *see also Eisenberg*, 814 N.Y.S.2d at 870 ("We note that defendants do

13  not claim to have been misled or prejudiced by the assumed name."). The Court should

14  find that YTC is bound by the Agreement for the same reasons.

15         Defendants concede that "YTC Travel, LLC" (LLC), the erroneously included

16  counterparty in the Agreement, is a non-existent entity. (Background at 4). Indeed,

17  LLC is a mere misnomer, surname, or a colloquial title for "Your Travel Center, Inc."

18  (YTC). Further, Defendants do not and cannot dispute that the parties intended to bind

19  YTC, the only existing YTC entity that meets each of the descriptions of "YTC" in the

20  Agreement and the only YTC entity that owns the travel management business that

21  FROSCH agreed to acquire. (*Id.*). Nor do Defendants argue that FROSCH was under

22  some misapprehension at the time it signed the contract that there was another YTC-

23  related entity with virtually the same name conducting the same business. In fact,

24  FROSCH relied on YTC's COO to fill in the name of the correct YTC entity that would

25

26         [7] The reason behind the rule is not hard to fathom. It would invite fraud and
    undermine the certainty of contracts if one party (perhaps to hedge against its own
27  buyer's remorse) could sign in the name of a non-existent entity and later leverage the
    counterparty's ignorance to renege.
28

be the counterparty to the Agreement, and she erroneously included the misnomer for non-existent LLC.  (*Id.*).  Defendants, therefore, cannot argue that they were misled or prejudiced.

Putting the misnomer rule aside, the pleaded facts present a textbook situation for reformation.  "A claim for reformation of a written instrument must set forth (1) an agreement other than that expressed in the instrument; (2) the written instrument sought to be reformed; and (3) mutual mistake of the parties, or the mistake of one party and the fraud of the other."  *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 407, 415 (S.D.N.Y. 2010) (denying motion for judgment on the pleadings to dismiss reformation counterclaim).  In the case of mutual mistake, "the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement."  *Id.*  That is precisely what FROSCH has alleged here.  (Compl. ¶¶ 76-82).

New York courts reform contacts under circumstances virtually identical to those in this case where the wrong party is mistakenly named in a contract.  *See, e.g., EGW Temporaries, Inc. v. RLI Ins. Co.*, 919 N.Y.S.2d 752, 753 (4th Dep't 2011) (unanimously affirming judgment to reform a contract to include the correct counterparty).  In *EGW*, the plaintiff sued an insurance company for reformation alleging that, because of a mutual mistake, the insurance company issued a payment bond to the wrong entity.  *Id.* at 753.  The appellate court affirmed the judgment for plaintiff, holding that the wrong party "was named as the principal on the … bond by mutual mistake of the parties and that the court properly reformed the bond to reflect that it is to benefit [the correct party and not the wrong one]."  *Id.* at 753.  The mutual mistake in *EGW* parallels the mutual mistake at hand.

As set forth in the Complaint, Messrs. Leibman and Weatherhead agreed that YTC would report its airline sales through a FROSCH branch office and later sell itself to FROSCH.  (Background at 4-5).  Because YTC's COO mistakenly listed the wrong, non-existent LLC as FROSCH's counterparty, unbeknownst to the parties when they signed the contract, the parties mistakenly executed the Agreement with the wrong

-13-

1   counterparty.  (*Id.* at 4; Compl. ¶¶ 77-82).  Defendants do not and cannot argue that they

2   intended any entity besides YTC to be FROSCH's counterparty.[8]

3          Defendants' sole argument against reformation is that "Frosch took no steps to

4   correct that 'error' [i.e., the inclusion of the wrong entity's name] in the month leading

5   up to its execution of the document."  (Br. at 6).  But Defendants' ignore FROSCH's

6   allegation that Mr. Leibman **did not (and had no reason to) know** the wrong YTC-

7   related entity was named in the contract, including at the time when he signed it.

8   (Compl. ¶¶ 78, 80-82, 84-86).  Defendants' argument is all the more stunning given

9   their admission that LLC never existed.  (Br. at 1).  Either YTC and Sanchez knew at

10  the time of contracting that LLC did not exist (in which case, reformation is warranted

11  based on fraud), or they did not know that LLC did not exist (in which case, reformation

12  is warranted based on mutual mistake).  Defendants' suggestion that Mr. Leibman

13  should have known something about YTC that even YTC did not know, or should have

14  figured out YTC was defrauding him, finds no support in the law, which perhaps

15  explains why Defendants cite none.  In any event, discovery would enable the parties to

16  sort this out.

17          Defendants also cite a single case to argue that "the proper remedy for a mutual

18  mistake under these circumstances would be rescission", not reformation.  (Br. at 6

19

---

20          [8] Under New York law, contracts may also be reformed based on fraud where
     "the parties have reached agreement and, unknown to one party but known to the other

21   (who has misled the first), the subsequent writing does not properly express that
     agreement."  *Citibank*, 724 F. Supp. 2d at 415-16.  FROSCH has alleged fraud as an

22   alternative basis for reformation because Mr. Weatherhead knew – or should have
     known – that the Agreement identified a non-existent YTC-related entity, and

23   intentionally misrepresented or omitted the correct legal entity to deceive FROSCH to
     induce it to enter into an agreement with a non-existent entity.  (Compl. ¶ 87).  In

24   signing the Agreement, Mr. Leibman reasonably relied to his detriment on YTC's
     representations and omissions that LLC was the correct legal entity to be included as

25   FROSCH's counterparty.  (*Id.* ¶ 84).  Therefore, unbeknownst to Mr. Leibman but
     known to YTC, the Agreement does not properly express the parties' agreement to bind

26
27
28   YTC.  (*Id.* ¶ 88).

-14-

(citing *Gould v. Board of Educ.,* 81 N.Y.2d 446, 454 (1993))).  *Gould*, however, only held that "*[g]enerally*, a contract entered into under a mutual mistake of facts is voidable and *subject to rescission*".  *Id.* at 453.  *Gould* did **not** hold that reformation is not an appropriate remedy for mutual mistake.  Indeed, a case on which *Gould* relies in discussing rescission – *Schmidt v. Magnetic Head Corp.*, 468 N.Y.S.2d 649, 655 (2d Dep't 1983) – affirmed the denial of a motion to dismiss a reformation claim because "the complaint alleges a mutual mistake of the parties".  *Id.*

**B.**     **The Agreement Does Not Lack "Material Terms"**

> **1.   The Supposed Lack of a Duration Provision is of No Significance because the Agreement Contains a Termination Provision**

Defendants argue that the Agreement is "unenforceable, or at the very least, terminable at will" because it purportedly lacks a "defined duration".  (Br. at 7).  New York law and the Agreement's plain language refute that argument.

"New York limits [the policy of avoiding contracts with no definite terms] to contracts having no termination provisions and has held it inapplicable to contracts of the type before us here, which do provide for termination or cancellation upon the occurrence of a specified event."  *Payroll Express Corp. v. The Aetna Casualty and Surety Co.*, 659 F.2d 285, 291 (2d Cir. 1981) (reversing portion of district court's judgment that added a specific duration to a contract that had a termination provision); *accord Nicholas Labs. Ltd. v. Almay, Inc.*, 900 F.2d 19, 21-22 (2d Cir. 1990) (affirming judgment for plaintiff and holding that contract was not terminable at will even though it had no duration because it contained termination provisions).[9]

The Agreement, like the contracts in *Payroll Express*, *Nicholas Labs*, and *Warner-Lambert*, provides for the parties continued performance until the sale of YTC

---

[9] *See also Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655, 661-62 (S.D.N.Y. 1959) (granting defendant summary judgment and holding that plaintiff could not unilaterally terminate a contract that did not have a specific duration because the contract conditioned termination of plaintiff's obligation "upon an event which would necessarily terminate the contract").

to FROSCH or until the termination provision's trigger.  Specifically, the Agreement provides that, if Mr. Leibman is no longer able to serve as President and CEO of FROSCH or if FROSCH changes ownership, "YTC will have an option to continue with this agreement **or to terminate at any time thereafter** merely by providing 30 days written notice." (Background at 6, above).  The parties' understanding of the inclusion of a term in the Agreement is underscored by language providing for YTC's continuous obligations "during the **term** of this Agreement and after its termination" (Compl., Ex. 1 ¶¶ 9(a), (b), (c)), meaning until FROSCH acquired YTC or until the termination provision was triggered.[10]  Until such time, YTC was required to continue performing.

### 2.  The Succession Provision is Not an Unenforceable "Agreement to Agree"

Defendants argue that the Agreement's succession provision – providing that YTC will sell itself to FROSCH upon a specific trigger at a specific price – is an unenforceable "agreement to agree" because it is tied to Mr. Weatherhead's spouse's and YTC's senior management's agreement to sell.  (Br. at 7-8).  To be clear, Defendants only argue that the succession provision's "'agreements to agree' are unenforceable" (*id.* at 8); they do not argue that the alleged unenforceability of this sole provision vitiates the entire Agreement.  Nonetheless, YTC's argument falls short.

---

[10] Defendants' cases are distinguishable because, among other reasons, the relevant contracts did not contain termination provisions.  *See, e.g., Gerard W. Purcell Assoc., Ltd. v. Royal Caribbean Cruise Line, Inc.*, No. 89-cv-7325, 1990 WL 106793 (S.D.N.Y. July 24, 1990); *Kosher Provisions, Inc. v. Blue & White Food Prods. Corp.*, No. 04-cv-361, 2005 WL 1890039 (E.D.N.Y. Aug. 9, 2005); *Fed. Deposit Ins. Corp. v. Northwood Projects, Inc.*, 407 N.Y.S.2d 424, 426 (Sup. Ct. N.Y. Cnty. 1978). Defendants' remaining case is distinguishable because the plaintiff alleged a tortious interference with contract claim, which FROSCH does not allege here.  *See Dorsett-Felicielli, Inc. v. Cnty. of Clinton*, No. 04-cv-1141, 2011 WL 1097859, at *4 (N.D.N.Y. Mar. 22, 2011) (contract was terminable at will and thus "cannot form the basis of a tortuous[sic] interference with contract claim").

-16-

New York courts enforce purported "agreements to agree" when they set forth a specific mechanism for reaching a future agreement.  The leading case is *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 74 N.Y.2d 475 (1989).  There, New York's highest court reversed the dismissal of a breach of contract claim and granted judgment to the plaintiff ordering specific performance for the sale of a nursing home. *Id.* at 478.  The contract provided the plaintiff with an option to buy the nursing home "at a price determined by the Department in accordance with the Public Health Law and all applicable rules and regulations of the Department".  *Id.* at 480.  The Court rejected defendant's argument that the contract was void for indefiniteness of the price term because the price could be determined objectively from the parties' intent:

> [A] price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula.  Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties.

*Id.* at 483.

In *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105 (1981), the Court concluded that a rental agreement was unenforceable because the agreement provided for renewals "at annual rentals to be agreed upon."  *Id.* at 111.  The Court noted, however, that its "concern is with substance, not form," and "**[i]t certainly would have sufficed … if a methodology for determining the rent was to be found within the four corners of the lease, for a rent so arrived at would have been the end product of agreement between the parties' themselves**."  *Id.* at 110.  In sum, provisions contemplating future agreements do not have the dispositive effect under New York law that Defendants' claim.  Rather, New York law looks to whether the

MURPHY &
McGONIGLE, P.C.

1   parties' intent could be determined objectively from a formula in the agreement or by

2   way of extrinsic evidence.[11]

3          The succession provision about which Defendants complain stands on even

4   firmer ground because it contains a specific, agreed-upon formula to calculate the

5   purchase price of YTC (five times YTC's EBITA for the last twelve months) and a

6   specific trigger for the sale to take place – "**whenever** Brenda [Weatherhead] chooses to

7   sell." (Compl., Ex. 1 ¶ 9(A)). YTC's argument that the provision is unenforceable

8   because it was tied to "*should* Brenda [Weatherhead] and YTC's Senior Management

9   agree" is a red-herring, as the Agreement provides that Mrs. Weatherhead already

10  agreed; it was just a matter of when the sale would take place. In addition, FROSCH

11  alleged that Mr. Leibman met and spoke with YTC's shareholders (i.e., Mr. and Mrs.

12  Weatherhead and Ms. Sanchez), and they agreed and confirmed that YTC would

13  ultimately sell its business to FROSCH. (Compl. ¶ 38). In short, this was not some

14  secret or contingent sale that needed additional negotiations or terms. Rather, everyone

15  was well aware – and specifically agreed – that FROSCH would purchase YTC on the

16  occurrence of a specific trigger and at a specific price based on a specific formula built

17  into the contract.[12]

18

19

20  _____

    [11] Defendants rely on a single case to support their "agreement to agree"

21  argument. (Br. at 8 (citing *Adjustrite Sys. Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543

22  (2d Cir. 1998))). That case is distinguishable because it concerned a preliminary

23  "proposal" that specifically called for the execution of several more formal agreements
    in the future, which did not occur. *Id.* at 545-46. That is not the case here.

24      [12] Defendants also complain that Paragraph 9(D) of the succession paragraph is an

25  unenforceable agreement to agree. (Br. at 8). That provision is completely irrelevant to
    FROSCH's claims, as it is not even mentioned in the Complaint. Moreover, even if it is

26  unenforceable, the appropriate remedy is to sever that provision, not nullify the entire

27  contract. *See Shukla v. Sharma*, 586 F.App'x 752, 755 (2d Cir. 2014) (Summary Order)
    (rejecting argument that unenforceable contractual provision voided the entire contract

28  as "contrary to the principle that unenforceable contract provisions are severable.").

-18-

**C.**     **The Agreement Does Not Lack Consideration**

Defendants argue that there was no consideration because (i) the separate guarantee states that it was to be executed (but never was) by Mr. Weatherhead in consideration for FROSCH's obligations, and (ii) FROSCH never established an ARC branch office at YTC's office.  (Br. at 8.)  Defendants again ignore New York law and the plain language of the Agreement.

The Agreement does not lack consideration.  Consideration "consists of either a benefit to the promisor or a detriment to the promise", and "it is enough that something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him."  *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982).  Applying this rule, New York courts routinely hold that language referencing the parties' "mutual covenants" provides for adequate consideration.  *See, e.g., Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 433, 436 (2013) (holding that the contract sufficiently stated consideration because it referred to "the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration").[13]  Here, the Agreement contains virtually identical language. (Background at 6 (providing that parties' agreement was "in consideration of the mutual covenants and promises herein contained and other good and valuable consideration")).  Moreover, the Agreement lists additional types of consideration.  (*See id*. (providing that YTC will report its airline sales through FROSCH's ARC branch and ultimately sell itself to FROSCH in exchange for receiving higher commissions and access to FROSCH's superior service providers, preferred vendors, support services and technology, and CRS contract)).

---

[13] *See also Thales Alenia Space France v. Thermo Funding Co., LLC*, 959 F. Supp. 2d 459, 467 (S.D.N.Y. 2013) (finding adequate consideration where contract stated it was made "for and in consideration of the mutual covenants and undertakings herein").

1    Defendants ignore these consideration allegations.  Instead, they argue that

2  Defendants' **only** consideration was set forth in the form guarantee, which is allegedly

3  insufficient because Mr. Weatherhead never signed it.  (Br. at 8).  But the form

4  guarantee was a separate agreement on which Defendants may not rely to import an

5  additional consideration requirement into the Agreement, which clearly sets forth the

6  parties' consideration.  *See Schron*, 20 N.Y.3d at 436 (holding that "the importation of

7  another [consideration] obligation, such as the separate loan obligation, would

8  impermissibly alter the writing in violation of the parol evidence rule.").  Nor may

9  Defendants rely on FROSCH's alleged failure to set up an ARC branch at YTC's office

10  because YTC's unilateral termination of the Agreement days after it was signed

11  frustrated FROSCH's ability to do so.  *See A-1 Gen. Contracting Inc. v. River Market

12  Commodities Inc.*, 622 N.Y.S.2d 378, 381 (3d Dep't 1995) ("It is the general rule [] that

13  a party to a contract cannot rely on the failure of another to perform when he has

14  frustrated or prevented performance.").

15  **D.    FROSCH Alleges Damages**

16    While conceding that FROSCH alleges damages, Defendants improperly attempt

17  to dispute a factual allegation on a motion to dismiss by arguing that FROSCH "alleges

18  no **real** damages".  (Br. at 9 (arguing that FROSCH's damages allegations are "simply

19  not believable")).  But Defendants may not dispute a factual allegation on a motion to

20  dismiss, at which stage the court accepts a plaintiff's allegations as true.  *Ashcroft v.

21  Iqbal*, 556 U.S. 662, 664 (2009).

22    Moreover, Defendants' sole argument is that FROSCH suffered no "real"

23  damages because Defendants purportedly terminated the Agreement "within several

24  days" of its execution.  (Br. at 9).  Defendants appear to believe that they can sign a

25  contract and avoid any damages by unilaterally terminating it after having a change of

26  heart.  The law, however, provides otherwise. *See, e.g., Omega Eng., Inc. v. Omega,

27  S.A.*, 432 F.3d 437, 445 (2d Cir. 2005) (affirming a judgment enforcing an agreement:

28

-20-

"It is an elementary principle of contract law that a party's subsequent change of heart will not unmake a bargain already made.").[14]

## IV.   DEFENDANTS' ARGUMENTS AGAINST MR. WEATHERHEAD'S LIABILITY FAIL AS A MATTER OF LAW

FROSCH alleges a breach of contract claim against Mr. Weatherhead:  if YTC is not bound by the Agreement, Mr. Weatherhead is personally liable to FROSCH because he signed on behalf of non-existent LLC.  (Background at 7).  *See Ruso v. Morrison*, 695 F. Supp. 2d 33, 51 (S.D.N.Y. 2010) ("When an individual executes a contract as an agent on behalf of a non-existent principal, the contract remains valid but is enforceable against the individual who claims to be an agent.").  The Defendants do not dispute that point in their moving brief, thereby waiving it.  *See Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13-cv-4650, 2015 WL 769573, at *7 n.4 (S.D.N.Y. Feb. 24, 2015) (holding that an argument not raised in defendant's moving brief is waived).

Separately, FROSCH also alleges a claim against Mr. Weatherhead for breaching the personal guarantee included as a provision in the Agreement and failing to execute the separate personal guarantee attached as an exhibit to the Agreement.  (Background at 7).  Ignoring FROSCH's allegations, Defendants argue that Mr. Weatherhead cannot be personally liable because he did not sign the separate form guarantee.  (Br. at 9).  But FROSCH's claim is not based on the separate form guarantee.  Instead, it is based on the "Guaranty and Indemnity" provision that is included in the Agreement that Mr. Weatherhead signed, which provides that Mr. Weatherhead "shall guarantee to FROSCH the performance of YTC's obligations under this Agreement".  (Background at 7; Compl., Ex. 1 ¶ 5).

---

[14] Defendants' damages cases are distinguishable because, unlike here, the plaintiffs in those cases failed to even allege any damages.  (Br. at 9 (citing cases)).  As set forth above, Defendants do not – and cannot – dispute that FROSCH alleges damages to which it is entitled as a result of Defendants' breach.  (*See* Background at 8).

Defendants try to escape liability under this theory by arguing that Mr. Weatherhead signed the Agreement on LLC's behalf, not in his personal capacity. That argument fails under New York's five-factor test to determine if an agent who signed an agreement on behalf of a company intended to bind himself. The five factors New York courts consider are (1) the length of the contract, (2) the location of the liability provision in relation to the signature line, (3) the presence of the signatory's name in the agreement itself, (4) the nature of the negotiations leading to the contract, and (5) the signatory's role in the corporation. *See, e.g., Integrated Marketing & Promotional Solutions, Inc. v. JEC Nutrition, LLC*, No. 06-cv-5640, 2006 WL 3627753, at *3 (S.D.N.Y. Dec. 12, 2006). Where "several factors" weigh in favor of finding the agent intended to be personally liable, courts routinely deny individual defendants' motions to dismiss. *Id.* at *6 (denying motion to dismiss where three factors weighed against dismissal); *Consac Indus., Inc. v. LDZ Comercio Importacao E Exportacao LTDA*, No. 01-cv-3857, 2002 WL 31094855, at *3-4 (E.D.N.Y. Aug. 29, 2002) (denying motion for judgment on the pleadings where "several factors" weighed against dismissal).

In *JEC Nutrition*, the court denied dismissal because (1) the contract was only seven pages long; (2) the agent's name appeared in the agreement, including in the notice provision; and (3) the agent was the corporation's principal and CEO, which weighed "heavily in favor of [plaintiff]." 2006 WL 3627753, at *5-6; *see also Consac*, 2002 WL 31094855, at *12-13 (denying dismissal where agent was the company's director and personally negotiated the contract with plaintiff).[15] At least **four** of the five factors weigh against dismissal here: (1) The Agreement is only seven pages long (like the contract in *JEC Nutrition*); (2) Mr. Weatherhead's name appears throughout the Agreement, including in the succession and notice provisions; (3) Mr. Weatherhead is

---

[15] *See also Lehman Bros., Inc. v. Tutelar CIA Financiera, S.A.*, No. 95-cv-3772, 1997 WL 403463, at *3 (S.D.N.Y. July 17, 1997) (denying defendants' motion for summary judgment where, among other things, two of the individual defendants who signed the guarantee were the president and vice president of the company).

YTC's President and CEO, which weighs "heavily" in FROSCH's favor; and (4) Mr. Weatherhead personally negotiated the Agreement and served as Mr. Leibman's contact.  The relevant factors, therefore, strongly weigh in favor of denying Defendants' motion to dismiss the claims against Mr. Weatherhead.

## CONCLUSION

For the foregoing reasons, FROSCH respectfully submits that the Court deny Defendants' motion in its entirety.

DATED:  May 29, 2015            MURPHY & McGONIGLE, P.C.


                               /s/ Michael V. Rella
                               _____
                               Michael V. Rella
                               mrella@mmlawus.com
                               Soren Packer
                               spacker@mmlawus.com
                               1185 Avenue of the Americas
                               21st Floor
                               New York, New York 10036
                               Tel:  (212) 880-3999
                               Fax:  (212) 880-3998

                               *Attorneys for Plaintiff*
                               *FT TRAVEL – NEW YORK, LLC*
                               *d/b/a FROSCH TRAVEL*

Of Counsel:

MEYLAN DAVITT JAIN AREVIAN & KIM LLP
Vincent J. Davitt
Shaunt T. Arevian
444 South Flower Street, Suite 1850
Los Angeles, California 90071
Telephone:  (213) 225-6000
Facsimile:   (213) 225-6660