1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10

11   FT TRAVEL - NEW YORK, LLC, d/b/a    )   CASE NO. CV 15-01065 MMM (MANx)
     FROSCH TRAVEL,                      )
12                                       )
                                         )
13              Plaintiff,               )   ORDER GRANTING IN PART AND
                                         )   DENYING IN PART DEFENDANTS'
14        vs.                            )   MOTION TO DISMISS
                                         )
15   YOUR TRAVEL CENTER, INC.; YTC       )
     TRAVEL, LLC; and COLIN              )
16   WEATHERHEAD,                        )
                                         )
17              Defendants.              )
                                         )
18   _____)

19

20        On February 13, 2015, FT Travel New York, LLC, d/b/a Frosch Travel ("Frosch"), filed this

21   breach of contract action against Your Travel Center, Inc. ("YTC"), YTC Travel, LLC ("LLC"), and

22   Colin Weatherhead (collectively, "defendants").[1]  On April 10, 2015, defendants filed a motion to

23   dismiss Frosch's complaint for failure to state a claim on which relief could be granted under Rule

24

25

26

27   _____

28        [1]Complaint, Docket No. 1 (Feb. 13, 2015).

12(b)(6) of the Federal Rules of Civil Procedure.[2]  Frosch opposes defendants' motion.[3]

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds this matter appropriate for decision without oral argument.  The hearing calendared for June 29, 2015, is therefore vacated, and the matter is taken off calendar.

# I. FACTUAL BACKGROUND

## A.     The Parties

Frosch is a travel management company that has headquarters in Houston, Texas and New York, New York.[4]  It was founded more than forty years ago and specializes in providing high-touch leisure and corporate travel services to individuals and companies by, among other things, selling air transportation.[5]  It purportedly employs more than 1,400 employees nationwide.  Its current president and Chief Executive Officer ("CEO") is Bryan Leibman.[6]  During Leibman's tenure, Frosch has purportedly been ranked as one of the top ten travel management companies in the United States.[7]

YTC is an independent retail travel agency that is headquartered in Santa Barbara, California.[8]  Colin Weatherhead is YTC's current president and CEO.[9]  YTC allegedly provides services similar to those offered by Frosch; specifically, YTC sells air transportation and various other travel services to its clients.[10]  Unlike Frosch, however, YTC allegedly operates on a smaller scale – it maintains

---

[2]Notice of Motion and Motion to Dismiss Case ("Motion"), Docket No. 22 (Apr. 10, 2015).  See also Reply in Support of Motion to Dismiss Case ("Reply"), Docket No. 32 (June 8, 2015).

[3]Opposition to Defendants' Motion to Dismiss ("Opposition"), Docket No. 31 (May 29, 2015).

[4]Complaint, ¶¶ 3, 10.

[5]*Id.*, ¶ 10.

[6]*Id.*, ¶¶ 11-12.

[7]*Id.*, ¶ 10.

[8]*Id.*, ¶¶ 4, 14.

[9]*Id.*, ¶ 6.

[10]*Id.*, ¶ 14.

1   approximately seven offices and primarily serves clients in Southern California and Arizona.[11]  LLC is

2   a non-existent entity that Frosch asserts was mistakenly named in a business contract between Frosch

3   and defendants.[12]

4       **B.      Frosch's Relationship With YTC**

5       Leibman purportedly first met Weatherhead in 2009; during the ensuing five years, the men

6   developed a personal relationship.[13]  Frosch alleges that, on multiple occasions, Weatherhead professed

7   admiration for Frosch's business model and Leibman's leadership, and conveyed an interest in entering

8   into a business relationship with Frosch.[14]  To that end, Leibman and Weatherhead purportedly

9   discussed a contractual arrangement pursuant to which YTC would report all of its airline sales through

10  a Frosch Airlines Reporting Corporation ("ARC") branch office.[15]  The parties further purportedly

11  contemplated that when Weatherhead decided to retire from the travel management business, he would

12  sell YTC to Frosch for a price based on a formula set forth in a written sale agreement.[16]  As

13  consideration for its agreement to report airline sales through a Frosch ARC office and be purchased by

14  Frosch, YTC was purportedly to receive, *inter alia*, access to Frosch's network of service providers and

15  preferred relationships, and to benefit from Frosch's operating and technological expertise.[17]

16      The parties also purportedly contemplated that YTC would receive significant cash payments

17

18      ———————————————

19      [11]*Id.*

20      [12]*Id.*, ¶ 5 ("Upon information and belief, and as explained further below, Defendant YTC Travel, LLC, is a non-existent entity that is named as a Defendant in this lawsuit out of an abundance of caution in case it exists as a separate legal entity").

21

22      [13]*Id.*, ¶ 15.

23      [14]*Id.*

24      [15]*Id.*, ¶ 16.  An Airlines Reporting Corporation, or ARC, is allegedly an independent entity that

25  serves as the clearing agent for travel agencies' sales of airline tickets.  (See Complaint at 4 n. 1.)
    Travel agencies report their airline ticket sales to ARCs, which then coordinate the payment, *inter alia*,

26  of commissions from the airlines.  (*Id.*)

27      [16]*Id.*, ¶ 16.

28      [17]*Id.*, ¶ 17.

1   and credits in the form of "commissions" and "overrides" from airline companies as a result of reporting

2   airline sales through Frosch's ARC office.[18]   The amount of these commissions and overrides is

3   allegedly tied to the volume of sales reported by a travel agency through a particular ARC branch

4   office.[19]   As a result, smaller travel agencies allegedly receive small commission or override payments

5   because their air travel sales are generally on a small scale while large travel agencies purportedly

6   receive large commissions and overrides due to the substantial volume of sales they report through

7   ARCs.[20]  Frosch alleges that, under the agreement contemplated, YTC was likely going to receive larger

8   overrides and commissions by reporting its sales through Frosch's ARC branch office than it otherwise

9   would.[21]

10      At some point between 2009 and 2014, while Leibman and Weatherhead were purportedly

11   negotiating a business agreement between Frosch and YTC, Leibman allegedly traveled to YTC's office

12   in Arizona to meet with Weatherhead and YTC's other shareholders.[22]   Weatherhead also purportedly

13   traveled to Frosch's Houston headquarters to meet with Leibman during the course of negotiations.[23]

14   Frosch alleges that during the parties' numerous discussions between 2009 and 2014, Weatherhead

15   stated it was his intent to transfer YTC's business to Frosch and to have Frosch acquire YTC ultimately.

16   At no time was severing the planned business relationship discussed.[24]

17      Unbeknownst to Frosch, YTC allegedly entered into an agreement with another travel

18

19   _____

20      [18]*Id.*, ¶ 18.  A "commission" is an up-front payment made by an airline company to a travel
21   agency, which is based on a percentage of the price of airline tickets sold.  An "override" is a payment
     or credit made to a travel agency once the agency has reached a pre-determined goal of airline ticket
22   sales through a particular ARC branch office.  (See *id.*)

23      [19]*Id.*, ¶ 19.

24      [20]*Id.*

25      [21]*Id.*, ¶ 20.

26      [22]*Id.*, ¶ 22.

27      [23]*Id.*

28      [24]*Id.*, ¶ 21.

1    management company, Tzell Travel LLC ("Tzell"), on August 26, 2009 (the "Tzell Agreement").[25]

2    Under the terms of the Tzell Agreement, Tzell was purportedly obligated to establish a joint ARC

3    branch office with YTC (the "Tzell/YTC Branch") through which YTC was to report its airline and

4    other travel services sales.[26]

5    ###    C.    Frosch's Purported Contract with YTC

6         In November 2014, Leibman and Weatherhead allegedly resumed their discussion of a business

7    arrangement pursuant to which YTC would report all of its airline sales through Frosch's ARC branch

8    office and Frosch would ultimately acquire YTC.[27]   On November 23, 2014, Frosch and YTC

9    purportedly entered into an agreement (the "Frosch Agreement" or "Agreement") reflecting Leibman's

10   and Weatherhead's discussions.[28]

11        Frosch asserts that the Frosch Agreement was collectively negotiated and drafted by Leibman

12   and Weatherhead.[29]  It names two parties: FT Travel-New York, LLC, d/b/a Frosch Travel ("Frosch"),

13   and YTC Travel, LLC ("LLC").[30]  Frosch alleges that LLC is a non-existent entity that was erroneously

14   identified by Robin Sanchez, YTC's COO, on October 21, 2014, when she filled in the name of Frosch's

15   counter-party on the Frosch Agreement.[31]  The parties purportedly intended to name YTC as a party to

16   the contract.[32]

17        The Frosch Agreement allegedly requires YTC to report airline sales through Frosch's ARC

18

19
     _____

20   [25]*Id.*, ¶ 23.

21   [26]*Id.*

22   [27]*Id.*, ¶¶ 24-25.

23   [28]*Id.*, ¶ 26.  See also Complaint, Exh. 1 ("Agreement") at 1.

24   [29]*Id.*, ¶ 28.

25   [30]Agreement at 1.

26   [31]Complaint, ¶¶ 28-31.

27   [32]*Id.*, ¶ 30.

28

branch office.[33]  It states that "YTC shall transfer all of its business to an ARC . . . branch office of FROSCH at the YTC location; and in this regard, shall process all its client requests for air transportation using ARC facilities contracted to FROSCH."[34]  So that YTC could report airline sales through a Frosch branch office, Frosch agreed to establish an ARC branch office at YTC's main office and transfer the address of its ARC office to that location.[35]  After this was done, YTC was required to "begin reporting all of its airline sales through the FROSCH ARC."[36]  The Agreement sets forth a payment structure under which YTC would receive a portion of the commissions and overrides generated by sales it reported through the ARC branch.  Frosch was to receive the balance of the commissions and overrides.[37]

Frosch alleges that the Agreement required YTC to report airline sales through Frosch's ARC branch office until Weatherhead decided to sell YTC to Frosch.[38]  It also asserts the Agreement sets forth the process by which YTC would be sold to Frosch.[39]  The Agreement's "Succession" provision states, in relevant part:

"FROSCH and YTC wish to prepare for the following scenarios:

A)   Colin Weatherhead.  In the event Colin is no longer able to operate in his current capacity as CEO, the following will occur should Brenda [Weatherhead's wife] and YTC's Senior Management agree: 1) FROSCH will assume interim CEO responsibilities and work closely with YTC senior management including Brenda, Robin [YTC's COO], Jacki

---

[33]*Id.*, ¶¶ 32-33.

[34]Agreement at 1.

[35]Complaint, ¶ 34.

[36]Agreement, ¶ 1.

[37]*Id.*, ¶ 2(a).

[38]Complaint, ¶ 35.

[39]*Id.*

[YTC's CFO], Chris [YTC's CIO], and Shane [YTC's Implementation and Training Officer] for $100,000 annual fee; 2) FROSCH will have an option of first refusal to acquire all company shares except those of Robin Sanchez at the following formula (x5 trailing 12 months EBITDA with following adjustment for Colin's takeout) whenever Brenda chooses to sell; [and] 3) Grant Robin Sanchez an additional 5% of the company to vest 3 years from effective date of FROSCH ownership.

B)   Jacki.  In the event Jacki is no longer able to operate in her current capacity while Colin is still running YTC, the following will occur: 1) Colin/YTC will acquire Jacki's shares at the following formula set out in Jacki's current Ownership Agreement; 2) FROSCH will assume responsibility for the financial operations of YTC at the following terms (annual management fee of $120,000 which can be reviewed annually and adjusted if gross sales increase or decrease by more than 25%)."[40]

Frosch alleges that these provisions reflect the parties' intent that Frosch would ultimately acquire YTC's business.[41]  It contends that, in connection with the Agreement's "Succession" provision, Leibman met and spoke with YTC's shareholders, each of whom purportedly agreed and confirmed that YTC would ultimately be sold to Frosch.[42]

The Succession provision also states:

"[i]n the event that Bryan Leibman is no longer able to serve as CEO and President of FROSCH or if FROSCH changes ownership, the following will occur: 1) YTC will have an option to continue with this agreement or to terminate at any time thereafter merely

---

[40]Agreement, ¶¶ 9 (A), (B)

[41]Complaint, ¶¶ 35-37.

[42]*Id.*, ¶ 38.

7

1    by providing 30 days written notice."[43]

2    Frosch contends that this provision addresses termination of the Frosch Agreement and evidences the

3    parties' intent that YTC would perform under the Agreement so long as Leibman still ran Frosch.[44]

4    Paragraph 9 is purportedly the only termination provision in the contract that was contemplated and

5    intended by the parties.[45]

6         As consideration for the agreement, YTC was allegedly given access to Frosch's network of

7    service providers, preferred vendors, and support services, and paid increased commissions and

8    overrides for airline sales reported through Frosch's ARC branch office.[46] Frosch was purportedly going

9    to benefit by receiving increased commissions and overrides, and additional revenue, as a result of

10   YTC's reporting of airline sales through Frosch's ARC branch and its reporting of hotel bookings

11   through Frosch's global distribution systems.[47]

12        Paragraph 5 of the Agreement, titled "Guaranty and Indemnity," provides:

13        "The individuals referred to as YTC in this agreement (and their spouses[)] shall

14        guarantee to FROSCH the performance of YTC's obligations under this Agreement and

15        the payment of sums required to be paid to ARC in connection with the issuance of ARC

16        Traffic Documents from the FROSCH branch, and shall execute personal guarantees, in

17        the form attached as Exhibit A.

18        YTC shall indemnify and hold harmless FROSCH, its officers, directors,

19        employees and YTCs ('Indemnities') from and against any and all liabilities, damages,

20        expenses, claims, demands, suits, fines, or judgments including, but not limited to,

21        attorneys' fees, costs, and expenses incident thereto, which may be suffered by, accrued

22        against, charged to, or recovered from the Indemnities arising from the negligent or

23    ───────────────

24   [43]Agreement, ¶ 9(C).

25   [44]Complaint, ¶¶ 39-40.

26   [45]*Id.*, ¶ 41.

27   [46]*Id.*, ¶¶ 43-44.  See also Agreement, ¶¶ 2, 4, 7.

28   [47]Complaint, ¶¶ 45-46.  See also Agreement, ¶¶ 2, 7.

wrongful act, error, or omission of YTC from their failure to perform this Agreement."[48]

### D.       YTC's Termination of the Frosch Agreement

The day after Leibman and Weatherhead purportedly executed the Frosch Agreement, YTC allegedly provided notice to Tzell that it was terminating the Tzell Agreement within thirty days – i.e., by December 24, 2014.[49]  So that YTC's termination of the Tzell Agreement could become final, Leibman and Weatherhead allegedly agreed that YTC would begin to perform its obligations under the Frosch agreement on January 5, 2015.[50]

Frosch alleges that, following execution of the Agreement and in anticipation of YTC's commencement of performance, it advised its service providers, including major airlines, that YTC would begin to report airline sales through Frosch's ARC branch office and that, as a result, the ARC branch would report a higher volume of sales than it had previously.[51]  Frosch asserts, on information and belief, that its service providers took affirmative steps to plan for and accommodate the expected increased sales that were to be reported through Frosch's ARC.[52]

It also alleges, on information and belief, that Tzell acknowledged and accepted YTC's initial termination notice.[53]  It contends, on information and belief, that thereafter, Tzell's CEO, Barry Liben, began to intimidate Weatherhead in an effort to dissuade him from joining Frosch.[54]  This purportedly caused Weatherhead to unilaterally terminate the Frosch Agreement.[55]  In his termination email to Leibman, Weatherhead purportedly admitted that he had signed the Agreement, but noted that "certain

---

[48]Agreement, ¶ 5.

[49]Complaint, ¶ 50.

[50]*Id.*, ¶ 51.

[51]*Id.*, ¶ 52.

[52]*Id.*

[53]*Id.*, ¶ 53.

[54]*Id.*, ¶ 53.

[55]*Id.*, ¶ 54.

issues from both a legal and business perspective which have come to light over the past 48 hours" led him to reassess the propriety of a business arrangement with Frosch.[56]  Frosch contends that since Leibman remains Frosch's president and CEO and Frosch's ownership is the same as it was when the Agreement was executed, the termination provision has not been triggered.[57]  As a consequence, it asserts, YTC has breached the Frosch Agreement by failing to perform its contractual obligations.[58]

### E.   Frosch's Claims

Frosch pleads seven claims based on these facts.  The first and second causes of action allege claims for breach of contract against YTC; the first seeks specific performance of the Frosch Agreement,[59] while the second seeks damages caused by YTC's purported breach.[60]  The third cause of action alleges breach of contract against Weatherhead in his personal capacity and seeks damages caused by YTC's purported breach of the Agreement.[61]  The fourth claim names YTC and seeks reformation of the Agreement in the event the court finds that YTC is not the party named in the contract.[62]  The reformation claim is based alternatively on mutual mistake[63] and fraud.[64]  Frosch's fifth cause of action is alternative to the first through fourth claims,[65] and pleads breach of contract against

---

[56]*Id.*

[57]*Id.*, ¶ 55.

[58]*Id.*, ¶ 56.

[59]*Id.*, ¶¶ 57-63

[60]*Id.*, ¶¶ 64-69.

[61]*Id.*, ¶¶ 70-74.

[62]*Id.*, ¶¶ 75-89.  See also *id.*, ¶ 76 ("If the Court does not find that YTC is the correct, existing, legal entity that was the parties' intended counterparty to FROSCH under the FROSCH Agreement, the FROSCH Agreement should be reformed to reflect that YTC is FROSCH's counterparty to the FROSCH Agreement, and is bound by, and required to perform under, that agreement").

[63]*Id.*, ¶¶ 75-82.

[64]*Id.*, ¶¶ 83-89.

[65]*Id.*, ¶ 91.

1   LLC in the event the court "finds that LLC is a valid and existing legal entity and the correct legal entity

2   that the parties intended to be FROSCH's counterparty under the FROSCH Agreement."[66]   The sixth

3   cause of action is another breach of contract claim against Weatherhead, premised on the fact that he

4   signed the Agreement on behalf of LLC.[67]   This claim, like the fifth claim, is alternative to the first

5   through fourth causes of action, and seeks to hold Weatherhead personally liable under the Agreement

6   in the event the court concludes that there is a valid, binding contract between Frosch and LLC.[68]

7   Finally, Frosch's seventh cause of action, which is alternative to its first through sixth causes of action,

8   alleges breach of contract against Weatherhead based on allegations that he signed the Frosch

9   Agreement on behalf of a non-existent entity.[69]

10

11   ## II. DISCUSSION

12   ### A.   Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

13   A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.   A

14   _____

15   [66]*Id.*, ¶¶ 90-95.

16   [67]*Id.*, ¶¶ 96-100.

17
18   [68]*Id.*, ¶ 97 ("As an alternative to the First through Fourth Counts, if the Court finds that LLC is
     a valid and existing legal entity that is the correct legal entity that the parties intended to be FROSCH's
     counterparty under that agreement, Mr. Weatherhead is personally liable for breaching the FROSCH
19   Agreement").

20   [69]*Id.*, ¶¶ 101-06.   The court notes, as a threshold matter, that the mere fact that Frosch alleges
     multiple alternate theories of liability against defendants and alternate bases for reformation against
21   YTC does not render its claims implausible.   Rule 8(d)(2) of the Federal Rules of Civil Procedure allows
     a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in
22   a single count or defense or in separate ones."   FED.R.CIV.PROC. 8(d)(2).   If a party alleges alternate
     theories, "the pleading is sufficient if any one of them is sufficient."   *Id.*   See also *Anheuser-Busch*
23   *Companies, LLC v. Clark*, No. 13-CV-00415 GEB, 2013 WL 3788426, *2 (E.D. Cal. July 18, 2013)
     ("Rule 8(d)(2) authorizes '[a] party [to] state as many separate claims . . . as it has, regardless of
24   consistency'" (citation omitted)).

25   "However, pursuit of alternative relief does not relieve plaintiffs of their obligation to plead
     sufficient factual allegations in support of that request."   *Milo & Gabby, LLC v. Amazon.com, Inc.*, 12
26   F.Supp.3d 1341, 1353-54 (W.D. Wash. 2014) (citing *Garcia v. M-F Athletic Co.*, No. CV 11-2430, 2012
     WL 531008, *2 (E.D. Cal. Feb. 17, 2012) (noting that plaintiffs are allowed to plead in the alternative,
27   but finding, on a motion to dismiss, that plaintiff must allege facts that "plausibly suggest an entitlement
     to relief")).

28

1 Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the

2 absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*,

3 901 F.2d 696, 699 (9th Cir. 1988). The court must accept all factual allegations pleaded in the

4 complaint as true, and construe them and draw all reasonable inferences from them in favor of the

5 nonmoving party. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v.*

6 *Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

7 The court need not, however, accept as true unreasonable inferences or conclusory legal

8 allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544,

9 553-56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

10 factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

11 requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

12 will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to

13 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff

14 pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

15 for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S.

16 at 545 ("Factual allegations must be enough to raise the right to relief above the speculative level, on

17 the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations

18 omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint

19 to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that

20 content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and

21 *Twombly*).

22 **B.     Legal Standard Governing Breach of Contract Claims Under New York Law**[70]

23 To state a claim for breach of contract under New York law, "a complaint need only allege (1)

24 the existence of an agreement; (2) adequate performance by the plaintiff; (3) breach by the defendant;

25 and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d

26

27     [70]The parties agree that, based on the choice of law provision contained in the Frosch Agreement,
the contract is governed by New York law. (See Motion at 5 n. 2; Opposition at 9; see also Agreement,
28 ¶ 11(g).)

168, 177 (2d Cir. 2004) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also Wolff v. Rare Medium, Inc.*, 210 F.Supp.2d 490, 494 (S.D.N.Y. 2002) ("To establish a breach of contract under New York law, a plaintiff must plead the following elements: (i) the existence of a contract; (ii) a breach of the contract; and (iii) damages resulting from the breach," citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000)).  At the pleading stage, the plaintiff must "'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.'"  *Lan Sang v. Ming Hai*, 951 F.Supp.2d 504, 527 (S.D.N.Y. 2013) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F.Supp. 276, 286 (S.D.N.Y. 1991)).

### C.   Whether Frosch Has Plausibly Alleged Breach of Contract and Reformation Claims

Defendants seek dismissal of Frosch's complaint on the grounds that: (1) the Agreement lacks material terms – specifically, a defined duration;[71] (2) the Agreement's succession provision contains impermissible "agreements to agree";[72] (3) the Agreement lacks consideration;[73] (4) no defendant is bound by the Agreement;[74] and (5) Frosch has failed to allege damages resulting from defendants' purported breach.[75]  The court addresses each argument in turn.

#### 1.   Whether the Agreement Lacks Material Terms

Under New York law, a contract must be "'reasonably certain in its material terms'" in order to be legally enforceable. *Hudson & Broad, Inc. v. J.C. Penney Corp., Inc.*, 553 Fed. Appx. 37, 39 (2d Cir. 2014) (Unpub. Disp.) (quoting *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989)).  In determining whether a contract contains all material terms, courts apply a standard that is "'necessarily flexible, varying for example with the subject of the agreement, its complexity, the purpose for which the contract was made, the circumstances under which it was made, and the relation

---

[71]Motion at 7.

[72]*Id.* at 7-8.

[73]*Id.* at 8.

[74]*Id.* at 6, 9-10.

[75]*Id.* at 8-9.

of the parties.'" *Town of Eden v. American Ref-Fuel Co. of Niagara*, 284 A.D.2d 85, 88 (N.Y. App. Div. 2001) (quoting *Cobble Hill*, 74 N.Y.2d at 482-83). "In the absence of material terms, there is no contract and whatever agreement exists is simply too vague to be enforceable." *Gerard w. Purcell Associates, Ltd. v. Royal Caribbean Cruise Line, Inc.*, No. 89 CIV. 7325 (JFK), 1990 WL 106793, *2 (S.D.N.Y. July 24, 1990) (citing *Ginsberg Machine Co., Inc. v. JB Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965); *Arcan Transportation, Inc. v. Marine Midland Bank-Western*, 388 N.Y.S.2d 737, 738 (1976)).

Defendants argue that the Agreement is unenforceable because it lacks certain material terms.[76] Specifically, they assert the Agreement fails to identify the duration of the contract.[77] Frosch concedes the Agreement omits any mention of duration, but argues that "the [ ] lack of a duration provision is of no significance because the Agreement contains a termination provision."[78]

Under New York law, duration is considered a material term of a contract, and the absence of a term specifying duration can render a contract unenforceable. See, e.g., *Ocean Group LLC v. Marcal Manufacturing, LLC*, No. 09 civ. 7679 (CM), 2010 WL 4963155, *7 (S.D.N.Y. Dec. 2, 2010) ("Ocean Group's Amended Complaint fails to assert any of the material terms of the alleged contract, including the duration of the agreement and the terms of compensation"); *Gerard W. Purcell Associates*, 1990 WL 106793 at *2 ("Here, certain material terms were clearly lacking, such as the quantity of entertainers Purcell was to provide, as well as the duration of Purcell's provision of services during 1989. . . .  In the absence of material terms, there is no contract and whatever agreement exists is simply too vague to be enforceable" (citations omitted)); *Perfect Trading Co., Inc. v. Goldman, Sachs & Co.*, 653 N.Y.S.2d 116, 116 (1997) ("The first and second causes of action for breach of contract were properly dismissed since, as found by the IAS court, 'at most the oral communications . . . [reduced to] writing can be construed only as an agreement to agree' and did not provide the material terms of the contract related to compensation and duration," citing *Central Federal Savings, F.S.B. v. National Westminster Bank,*

---

[76]*Id.* at 6-7.

[77]*Id.*

[78]Opposition at 15.

1  *U.S.A.*, 574 N.Y.S.2d 18, 18 (1991)).

2        Nonetheless, even if a contract lacks a "defined duration," it can be enforced if it includes a

3  cancellation or termination provision.  As the Second Circuit has noted, "New York limits th[e] policy

4  [of voiding contracts that lack a defined duration] to contracts having no termination provisions and has

5  held it inapplicable to contracts . . . which [ ] provide for termination or cancellation upon the occurrence

6  of a specified event." *Payroll Exp. Corp. v. Aetna Casualty and Surety Co.*, 659 F.2d 285, 291-92 (2d

7  Cir. 1981) (citing *Warner-Lambert Pharmaceuticals Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655, 655

8  (S.D.N.Y. 1959), aff'd, 280 F.2d 197 (2d Cir. 1960); *Ketcham v. Hall Syndicate, Inc.*, 236 N.Y.S.2d 206,

9  206 (1962), aff'd, 242 N.Y.S.2d 182 (1963); *Ehrenworth v. George F. Stuhmer & Co.*, 229 N.Y. 210,

10  210 (1920); *Matter of Exercycle v. Maratta*, 201 N.Y.S.2d 885, 885 (1960), aff'd, 214 N.Y.S.2d 353

11  (1961)).  See also *Nicholas Laboratories Ltd. v. Almay, Inc.*, 723 F.Supp. 1015, 1018 (S.D.N.Y. 1989)

12  ("[W]here termination has been provided for in the contract, even if continuous performance is a

13  possibility, courts should not refuse to enforce such contracts or read into them different conditions of

14  termination" (citations omitted)).

15        Frosch argues that the Agreement contains a termination provision in the "Succession" section.[79]

16  The provision states:

17      "In the event that Bryan Leibman is no longer able to serve as CEO and President of

18      FROSCH or if FROSCH changes ownership, the following will occur: 1) YTC will have

19      an option to continue with this agreement or to terminate at any time thereafter merely

20      by providing 30 days written notice."[80]

21  Frosch argues that, consistent with the parties' intent and specific negotiations, this is the Agreement's

22  only termination provision.[81]  Although defendants counter that "there is no provision in the alleged

23      _____

24      [79]Opposition at 15-16.

25      [80]Agreement, ¶ 9 (C).

26      [81]Opposition at 15-16.  See also Complaint, ¶ 39 ("The 'Succession' provision also addresses

27  the parties' termination of the FROSCH Agreement by allowing YTC to 'terminate' the agreement only
upon the occurrence of a specifically defined event.  The agreement provides that, if Mr. Leibman is no

28  longer able to serve as FROSCH's President and CEO, or if FROSCH changed ownership, 'YTC will

1   agreement entitled, or styled . . . , a termination provision,"[82] they do not explain the legal significance

2   of this fact or cite authority for the proposition that a contract term providing for termination of an

3   agreement must bear that specific heading or caption.[83]

4       Notably, defendants do not dispute that paragraph 9(C) provides for termination of the contract

5   upon the occurrence of a specified event.  Given this fact, the court declines to dismiss Frosch's claims

6   on the basis that the Agreement lacks a material term.  See, e.g., *Payroll Exp. Corp.*, 659 F.2d at 292

7   (concluding that a contract was not unenforceable due to lack of a duration term where "the parties here

8   . . . agreed . . . that Aetna could terminate the policy upon Payroll's failure to pay premiums due");

9   *Nicholas Laboratories Ltd.*, 723 F.Supp. at 1018 ("[W]here termination has been provided for in the

10  contract, even if continuous performance is a possibility, courts should not refuse to enforce such

11  contracts"), aff'd, 900 F.2d 19 (2d Cir. 1990); *Ketcham*, 236 N.Y.S.2d at 212-13 ("The contract in the

12  case at bar[ ] is not indefinite as to duration.  Paragraphs 4, 5, and 6 provide specifically for termination

13  by either party upon the happening of certain events.  The contract provides that . . . 'each of the parties

14  shall have the right to terminate this agreement at the end of any one year period hereof in the event that

15  plaintiff's share fall[s] below the stipulated amount and the defendant at its sole discretion, to avoid a

16  termination of this agreement, failed to advance the difference in the minimum stipulated amount.'  The

17  plaintiff asserts that these provisions render the contract indefinite because they include no specific date

18

19

20  have an option to continue with this agreement or to terminate at any time thereafter merely by

    providing 30 days written notice'"); *id.*, ¶ 41 ("As the parties intended, this is the only termination

21  provision in the FROSCH Agreement, which the parties specifically negotiated.  YTC was therefore

    required to continue performing under the agreement as long as Mr. Leibman was running FROSCH,

22  or until Mr. Weatherhead decided to sell YTC – a decision that was entirely within YTC's control").

23      [82]Reply at 4.

24      [83]In any event, based on Frosch's allegations, there appears to be a reasonable explanation for

25  the fact that the termination provision is included in the Agreement's "Succession" provision. As Frosch

    has alleged, Weatherhead admired Leibman's leadership skills and Frosch's business model and

26  performance under his leadership.  (See Complaint, ¶ 15.)  As a result, Leibman and Weatherhead

    purportedly planned to have Frosch acquire YTC after Weatherhead left.  (*Id.*, ¶¶ 36-38.)  Accepting this

27  allegations as true, it is reasonable that the parties would have agreed that the Agreement could be

    terminated if Leibman, whom Weatherhead purportedly admired and respected, no longer ran Frosch.

28  (See, e.g., *id.*, ¶¶ 39-42.)

for the termination of the contract.  This, however, is not the kind of indefiniteness which renders the contract voidable, since specific provision is made for termination.  It is this specificity which destroys the plaintiff's case").  Cf. *Don King Productions, Inc. v. Douglas*, 742 F.Supp. 741, 763 (S.D.N.Y. 1990) (concluding that an agreement having a term of three years that was to be "automatically extended to cover the entire period [Douglas is] world champion and a period of two years following the date on which [Douglas] thereafter cease[s], for any reason, to be so recognized as world champion" was not void for indefiniteness because it "provide[d] for termination or cancellation upon the occurrence of a specified event" (citations omitted)).

Defendants argue, however, that the contract is "terminable at will" because it "lack[s] [ ] a duration term"; as a result, defendants assert that they "were free to terminate [the Agreement] and cannot be liable for breach."[84]  The court has concluded, however, that the termination provision in paragraph 9(C) sets forth a "determinable duration," which precludes a finding that the contract is terminable at will.  Cf. *Ketcham*, 236 N.Y.S.2d at 212 ("Absent a fixed or *determinable duration* or an express provision that the duration is perpetual, the contract is one terminable at will.  The contract in the case at bar, is not indefinite as to duration.  Paragraphs 4, 5, and 6 provide specifically for termination by either party upon the happening of certain events," citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 382 (1957) (emphasis original)).  This fact also distinguishes the case from the authority defendants cite in their moving papers.

In *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 607 F.Supp.2d 600, 602 (S.D.N.Y. 2009), Judge Jed Rakoff of the Southern District of New York denied plaintiff's untimely motion to amend its complaint noting, *inter alia*, that granting the plaintiff leave to amend its dismissed wrongful termination claim would be futile.  Judge Rakoff had previously rejected plaintiff's assertion that its contract with the defendant was perpetual, concluding that the parties had not expressly stated such an intent.  *Id.* ("As the Court emphasized in dismissing CESPA's wrongful termination claim, if the parties to a contract intend for it be perpetual, they must expressly say so.  Here, as noted, the EBA has no definite term and provides no end date for its duration").  Because the contract had no "fixed or

---

[84]Motion at 7.

1 determinable duration" and did not include "an express provision [stating] that the duration [was]

2 perpetual," Judge Rakoff dismissed the wrongful termination claim, finding that the contract was at will.

3 *Id.* (citing *Warner-Lambert Pharm. Co.*, 178 F.Supp. at 661; *Ketcham*, 236 N.Y.S.2d at 206). Here, by

4 contrast, Frosch does not argue that the contract was *perpetual*, i.e., that it was to continue in perpetuity

5 without no possibility of termination. Rather, it asserts that the Agreement was terminable on the

6 occurrence of a specific event – i.e., Leibman's departure from Frosch or Frosch's change of ownership.

7 Judge Rakoff's order in no way indicates that the contract in *Compania Embotelladora* contained a

8 similar provision.

9     Similarly, in *Federal Deposit Insurance Corp. v. Northwood Projects, Inc.*, 407 N.Y.S.2d 424,

10 426-27 (1978), the New York Supreme Court declined to find that a stockholder agreement that

11 provided stockholders would indemnify the defendant corporation and give it guarantees was perpetual,

12 noting that there was "no provision in the stockholders' agreement which required that [defendant] have

13 a continuing obligation to execute guarantees with respect to corporate debts incurred after his

14 relationship with the corporation and other stockholders had been terminated." Frosch does not argue

15 that the Agreement was perpetual in duration, however; it contends that the Agreement *includes a*

16 *termination provision* and thus is not void for indefiniteness. As a result, *Federal Deposit Insurance*

17 *Corp.* is inapposite and does not compel the conclusion that the contract is terminable at will.

18     In their reply, defendants argue that the Agreement provides it is terminable at will, not merely

19 under the circumstances enumerated in paragraph 9(C).[85] They cite paragraph 8 of the Agreement,

20 which states, in relevant part:

21     "(a)    During the term of this Agreement and *after its termination for any reason*,

22         FROSCH and YTC agree not to furnish to any person, firm, company, or

23         corporation engaged in a business competitive with the other party, any

24         information whatsoever as to the other party's relations, agreements, or contracts

25         with its suppliers, its vendors (including, but not limited to, airlines, hotels, and

26

27           

28     [85]Reply at 4 ("Nowhere does the alleged agreement state that these are the only two circumstances in which LLC may ever terminate the parties' relationship, as Frosch now contends").

car rental agencies), its clients (or the clients of other commission agents or contractors working with it) including the other party's client mailing list, list of customers, suppliers, prices, terms, and negotiations, or other information concerning the other party, its employees, contractors or their business.

(b)     Without the consent of FROSCH, during the term of this Agreement *and after its termination for any reason*, for a period of (3) three years from termination, YTC shall neither solicit nor service the clients of FROSCH who were clients of FROSCH, its commission agents or contractors at the termination of this Agreement or at any time in the previous (3) three years nor solicit officers, employees, or independent contractors to terminate their relationship with FROSCH.   Likewise, without the consent of YTC, during the term of this Agreement and for a period of (3) three years from its *termination for any reason*, FROSCH shall neither solicit nor service the clients of YTC who were clients of YTC, their commission agents or contractors on the date this Agreement was made or during its term, nor solicit officers, employees, or independent contractors to terminate their relationship with YTC."[86]

Because this provision includes the phrase "after its termination for any reason," defendants contend it is "clear[ ] that the alleged agreement was terminable at will."[87]

This argument was not raised in defendants' motion, which asserted only that the contract was terminable at will due to "the lack of a duration provision";[88] rather, it was raised for the first time in reply.[89] Courts decline to consider arguments that are raised for the first time in reply.  See, e.g., *Ellison Framing, Inc. v. Zurich American Ins. Co.*, 805 F.Supp.2d 1006, 1011 n. 1 (E.D. Cal. 2011) (noting that "[t]he court typically cannot consider arguments first raised in reply"); *Stewart v. Wachowski*, No. CV

---

[86]Agreement, ¶¶ 8(a), (b) (emphasis added).

[87]Reply at 4.

[88]Motion at 7.

[89]Reply at 4.

03-02873 MMM, 2004 WL 2980783, *11 (C.D. Cal. Sept. 28, 2014) (refusing to consider an argument raised for the first time in reply); *Halliburton EnergyServices, Inc. v. Weatherford International, Inc.*, No. Civ. A. 302 CV 1347-N, 2003 WL 22017187, *1 n. 1 (N.D. Tex. Aug. 26, 2003) ("Halliburton offers additional grounds for reconsideration in its reply[;] however, the grounds are not proper under Rule 59(e), . . . and the Court will not consider an argument raised for the first time in a reply brief"); *Dietrich v. Trek Bicycle Corp.*, 297 F.Supp.2d 1122, 1128 (W.D. Wis. 2003) ("Defendant raised this argument for the first time in its reply brief.  Because this argument should have been raised earlier or not at all, I will not consider it"); *Public Citizen Health Research Group v. National Institutes of Health*, 209 F.Supp.2d 37, 44 (D.D.C. 2002) ("The Court highly disfavors parties creating new arguments at the reply stage that were not fully briefed during the litigation. . . .  By placing a new argument in the Reply, Plaintiff does not permit Defendant or Intervenor-Defendant to competently respond to such an argument"); *Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.*, 119 F.Supp.2d 1083, 1103 n. 15 (C.D. Cal. 2000) ("Although the defendants raised a laches defense in their opposition to the plaintiffs' motion for summary judgment, the first time they raised a statute of limitations defense was in their reply brief. The Court need not, and does not, consider arguments raised for the first time in a reply brief"). Accordingly, the court declines to consider whether the "lack of a duration term"[90] renders the contract terminable at will.

### 2.    Whether the Agreement Contains an Unenforceable "Agreement to Agree"

Defendants next contend that the contract is unenforceable because it purportedly contains several "agreements to agree."[91]  As the New York Court of Appeals has observed, "it is [ ] well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109-10 (1981) (citing *Willmott v. Giarraputo*, 5 N.Y.2d 250, 253 (1959)).  See also *Adjustrite Sys. Inc. v. GAB Business Services, Inc.*, 145 F.3d 543, 548 (2d Cir. 1998) ("[W]here the parties contemplate further negotiations and the execution of a formal instrument, a preliminary

---

[90]Motion at 7.

[91]*Id.* at 7-8.

agreement does not create a binding contract").

Defendants identify two purportedly impermissible "agreements to agree" in the Frosch Agreement – Paragraphs 9(A) and 9(D).[92]  Paragraph 9(A) states:

"Colin Weatherhead.  In the event Colin is no longer able to operate in his current capacity as CEO, the following will occur should Brenda and YTC's Senior Management agree: 1) FROSCH will assume interim CEO responsibilities and work closely with YTC senior management including Brenda, Robin, Jacki, Chris, and Shane for $100,000 annual fee; 2) FROSCH will have an option of first refusal to acquire all company shares except those of Robin Sanchez at the following formula (x5 trailing 12 months EBITDA with following adjustment for Colin's takeout) whenever Brenda chooses to sell; [and] 4) Grant Robin Sanchez an additional 5% of the company to vest 3 years from effective date of FROSCH ownership."[93]

Defendants contend that this provision is an impermissible "agreement to agree" because it leaves a material term, i.e., succession and Frosch's option of first refusal to acquire YTC, subject to further "negotiation."[94]  The court cannot agree.

Contrary to defendants' contention, paragraph 9(A) does not leave "material terms of [the] proposed contract for future negotiation" by the parties.  *Andor Group, Inc. v. Benninghoff*, 631 N.Y.S.2d 79, 80 (1995) (citing *Shumacher*, 52 N.Y.2d at 109).  Rather, it reflects that the parties negotiated and agreed on the steps that would be taken if Weatherhead was no longer CEO of YTC – i.e., that Brenda Weatherhead and YTC senior management would meet and approve the succession terms detailed in the provision.  It does not require the negotiation of new terms nor does it call for preparation and execution of contract documents; the price and process by which Frosch will acquire

---

[92]*Id.*

[93]Agreement, ¶ 9(A).

[94]Motion at 7-8; Reply at 5 ("While it is true that Paragraph 9(A) contains a defined formula, the application of that formula is expressly made contingent upon 'Brenda and YTC's Senior Management' agreeing in the future.  If no such agreement is reached, the formula would not be applied").

YTC is set forth in detail.[95]   Cf.   *Carmon v. Soleh Boneh Ltd.*, 614 N.Y.S.2d 555, 556 (1994) (concluding that a contract that provided that the "exact nature of the legal entity to be formed" upon the happening of certain conditions would be determined by the parties following study, as would the elements of future profit is enforceable, citing *Teachers Insurance and Annuity Association of America v. Tribune Co.*, 670 F.Supp. 491, 499 (S.D.N.Y. 1987)).   While the provision appears to give Brenda and YTC senior management the right to approve the terms at some future time, "'a contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement.'"   *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)).

As a consequence, the court cannot agree that Frosch's claims must be dismissed at this stage because paragraph 9(A) constitutes an "agreement to agree."[96]   Compare *Danton Construction Corp.*

---

[95]Agreement, ¶ 9.

[96]Although it declines to dismiss on this basis, the court does not, in this order, definitively decide that the Agreement's succession provision is not an "agreement to agree"; as most New York courts observe, this type of determination is not properly made at the pleadings stage, but instead following development of the factual record in the context of a motion for summary judgment or by the trier of fact at trial.   See, e.g., *Caruso v. Grace*, No. Civ. 2353 (SAS), 2011 WL 4472479, *9 (S.D.N.Y. Sept. 27, 2011) (denying defendant's motion to dismiss a breach of contract action on the grounds that the agreement was "so lacking in definiteness that it constitute[d] nothing more than 'a mere agreement to agree'"); *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08 Civ. 10578 (RJS), 2010 WL 1257326, *6 (S.D.N.Y. Mar. 12, 2010) ("While discovery will reveal whether Plaintiffs can prove, with any degree of precision, how Defendants applied the factors of the alleged 'formula,' at this stage of the litigation Plaintiffs' allegations are not so indefinite as to compel the conclusion that, as a matter of law, there is no enforceable contract").   Compare *Major League Baseball Properties, Inc. v. Opening Day Productions, Inc.*, 385 F.Supp.2d 256, 271-72 (S.D.N.Y. 2005) (granting summary judgment where, based on the evidence adduced by the parties, it was clear "there was never a meeting of the minds between the parties").   The court merely concludes, at this stage, that "taking the Agreement as stated by Frosch," the succession provision is not so lacking in definiteness that it constitutes nothing more than a "mere agreement to agree."   *Caruso*, 2011 WL 4472479 at *9 ("Finally, Grace insists that the Agreement in question is so lacking in definiteness that it constitutes nothing more than 'a mere agreement to agree.'   Taking the Agreement as stated by Caruso, however, its content is clear").

As Frosch observes, a court's determination of whether an alleged agreement constitutes an unenforceable "agreement to agree" is often a factual question that is best resolved on summary judgment.   See, e.g., .   The court does not

*v. Bonner*, 571 N.Y.S.2d 299, 300-01 (1991) ("Applying these principles at bar, we find that by reserving a vague right to 'reformat' the terms of the proposed conveyance, the defendant sellers left significant terms of the transaction open to future negotiation.  Since the parties never came to a meeting of the minds as to the essential terms of the proposed conveyance, and never executed a formal contract as contemplated by the option letter, we find that the option letter was no more than an unenforceable "agreement to agree,'" citing *Engle v. Lipcross Inc.*, 544 N.Y.S.2d 638, 638 (1989); *Ramos v. Lido Home Sales Corp.*, 539 N.Y.S.2d 63, 63-64 (1989)); *Bernstein v. Felske*, 533 N.Y.S.2d 538, 540 (1988) ("In the case at bar, the letter of intent leaves for future negotiation provisions for limiting the amount of loans, restricting transfer of each venturer's interest, and delineating management responsibility. Absent any indication in the letter of intent of an objective method, independent of each party's mere wish or desire, upon which to make these provisions definite, we must decline to supply them by implication, since in this case, 'the void is too great, the omissions are too noticeable and the risk of ensnaring a party in a set of contractual obligations that he never knowingly assumed is too serious'" (citations omitted)).

As respects defendants' second argument, ¶ 9(D) states:

"In the event other scenarios occur unforeseen above, FROSCH and YTC shareholders, including Colin and Brenda Weatherhead, agree to meet in good faith to achieve an equitable outcome in the spirit of the cooperation between Bryan, Colin, Brenda, Robin, and Jacki – current shareholders of FROSCH and YTC at the time of signing this agreement."[97]

Defendants assert this provision is an impermissible agreement to agree because it "acknowledges that the parties had not come to a meeting of the minds concerning critical issues of succession."[98]  Once again, the court is not persuaded.

While paragraph 9(D) might have been an impermissible "agreement to agree" if it was the sole succession provision in the Agreement – as that would indicate that the parties elected not to consider

---

[97]Agreement, ¶ 9(D).

[98]Reply at 5-6.

the issue of succession as part of the contract – the parties *did* negotiate various issues related to succession.  The fact that they did not negotiate or resolve *all* issues does not render the terms they did resolve an impermissible "agreement to agree."  Moreover, this provision represents nothing more than a contract to negotiate in good faith in the event unforeseen circumstances arise in the future.  New York courts have routinely found such provisions enforceable.  See, e.g., *EQT Infrastructure Ltd. v. Smith*, 861 F.Supp.2d 220, 229 (S.D.N.Y. 2012) ("[P]arties can contractually obligate themselves to negotiate in good faith").

### 3.    Whether the Agreement Lacks Consideration

Defendants also contend the court should dismiss Frosch's claims because the Agreement lacks consideration.[99]  Under New York law, "[i]t is well established that the 'slightest consideration is sufficient to support the most onerous obligation' and that the courts are not to inquire into the adequacy of consideration."  *Continental Energy Corp. v. Cornell Capital Partners, L.P.*, No. 04 Civ. 260 GEL, 2005 WL 3543972, *2 (S.D.N.Y. 2005) (quoting *Caisse Nationale de Credit Agricole v. Valcorp, Inc.*, 28 F.3d 259, 265 (2d Cir. 1994)).  "Generally, parties are free to make their own bargains, and, absent a claim of fraud or unconscionability, it is enough that something of real value in the eye of the law was exchanged.  *Ferguson v. Lion Holdings, Inc.*, 312 F.Supp.2d 484, 494 (S.D.N.Y. 2004).  As the New York Court of Appeals has explained, "'[i]t is enough that something is promised, done, foreborne, or suffered by the party to whom the promise is made as consideration for the promise made to him.'"  *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 58 F.Supp.2d 228, 252 (S.D.N.Y. 1999) (quoting *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982)).

Defendants argue that because Weatherhead never signed the guaranty attached to the Agreement as Exhibit A and because Frosch did not establish a new ARC branch office at YTC's headquarters, as was contemplated, Frosch's claims must be dismissed for lack of consideration.  The court cannot agree.

Although under New York law, consideration is required for a contract to be valid, see *Weiner*, 57 N.Y.2d at 463, "[a]s a matter of pleading,[ ] the prevailing rule [among New York courts] is that

---

[99]Motion at 8.

consideration need not be pled in the complaint, and that lack of consideration is best treated as an affirmative defense." *Thomas H. Lee Equity Fund V, L.P. v. Bennett*, No. 05 Civ. 9608 (GEL), 2007 WL 950133, *2 (S.D.N.Y. Mar. 28, 2007) (citations omitted).  As a result, New York courts routinely deny Rule 12(b)(6) motions that seek dismissal on the basis of a lack of consideration.  See, e.g., *Dumont v. Litton Loan Servicing, LP*, No. 12-cv-2677-ER-LMS, 2014 WL 815244, *7 (S.D.N.Y. Mar. 3, 2014) ("Defendants urge the Court to dismiss Williams's claim because it does not allege offer, acceptance, consideration, and meeting of the minds. . . .  The *Bennett* approach seems to be in line with the standard set forth in *Twombly* and *Iqbal*.  While each specific element of contract formation will need to be present in order for Williams to prevail at trial (or at summary judgment), her claim for breach is not implausible merely because she fails to address each of those sub-elements at this stage," citing *Thomas H. Lee Equity Fund*, 2007 WL 950133 at *2); *Sweringen v. New York State Dispute Resolution Association (NYSDRA)*, No. 1:05-CV-428 (NAM/DRH), 2007 WL 2403197, *8 (N.D.N.Y. Aug. 17, 2007) (denying a motion to dismiss breach of contract claims based on plaintiff's failure to allege consideration); *Jaufman v. Levine*, No. 1:06-CV-1295 (NAM/DRH), 2007 WL 2891987, *12 (N.D.N.Y. Sept. 28, 2007) ("Under New York law, '[i]t is well established that the 'slightest consideration is sufficient to support the most onerous obligation' and that the courts are not to inquire into the adequacy of consideration.' . . .  [Thus,] dismissal based upon inadequacy of consideration is not appropriate at this time.  Accordingly, defendants' motion to dismiss the fourth cause of action is denied," citing *Granite Partners, L.P.*, 58 F.Supp.2d at 256); *Thomas H. Lee Equity Fund*, 2007 WL 950133 at *2 (denying a motion to dismiss for failure to allege consideration after concluding that "consideration is best treated as an affirmative defense" and need not "be pled in the complaint").

Because Frosch does not have to plead consideration to allege a plausible breach of contract claim under New York law, defendants' motion to dismiss on this basis is denied.

### 4.    Whether Defendants Are Bound by the Agreement

Defendants next contend that Frosch's claims must be dismissed because the purported agreement does not bind any of the defendants.[100]

---

[100]Motion at 6-7, 9-10.

### a.   Whether LLC Is Bound by the Agreement

Defendants first argue that the fifth and sixth causes of action against LLC and Weatherhead for signing on behalf of LLC must be dismissed because the claims "identif[y] as [Frosch's] counterparty an entity that does not exist."[101]   A nonexistent entity cannot "acquire rights by contract or otherwise, incur debts or other liabilities either in contract or tort, sue or be sued." *Farrell v. Housekeeper*, 298 A.D.2d 488, 489 (N.Y. App. Div. Oct. 21, 2002) (citing *Kiamesha Devel. Corp. v. Guild Props.*, 4 N.Y.2d 378, 389 (1958); *Judarl v. Cycletech, Inc.*, 667 N.Y.S.2d 451, 451 (1998); *Mindlin v. Gehrlein's Marina*, 295 N.Y.S.2d 172, 173-74 (1968)).   See also, e.g., *442 Decatur Street, LLC v. Spheres Realty, Inc.*, 14 A.D.3d 535, 535-36 (N.Y. App. Div. Jan. 18, 2005) (holding that an LLC that had not yet filed its articles of organization did not exist and lacked capacity to enter into a contract); *183 Holding Corp. v. 183 Lorraine Street Associates*, 251 A.D.2d 386, 386-87 (N.Y. App. Div. June 8, 1998) (holding that a corporation that had not filed its certificate of incorporation did not yet exist and lacked capacity to contract).   "'It is well-settled under contract formation law in New York that there must be two parties to a contract. . . .   If one of the parties is wanting, then one of the formal constituents of a legal transaction is absent.'" *Animazing Entertainment, Inc. v. Louis Lofredo Associates, Inc.*, 88 F.Supp.2d 265, 270 (S.D.N.Y. 2000) (quoting *International Sport Divers Ass'n v. Marine Midland Bank, N.A.*, 25 F.Supp 2d 101, 112 (W.D.N.Y. 1998)).

In its complaint, Frosch alleges that LLC is a nonexistent entity.[102]   Accepting this allegation as true, LLC is a nonexistent entity that cannot be bound by a contract; accordingly, Frosch's fifth and sixth claims for relief must be dismissed.[103]

### b.   Whether YTC Is Bound by the Agreement

Frosch advances two arguments as to why YTC is bound by the Agreement.   First, it contends

---

[101]*Id.* at 6.

[102]Complaint, ¶ 5.

[103]In its opposition, Frosch seeks leave to withdraw its fifth and sixth causes of action based on defendants' concession that LLC is a non-existent entity. (See Opposition at 8 n. 4 ("Two of FROSCH's claims are pleaded in the alternative based on LLC being a valid and existing legal entity.   Because Defendants now concede LLC is a 'non-existent counterparty.'   FROSCH withdraws those claims").

that the contract is enforceable as written, because the reference in the contract to LLC is a mere "misnomer" for YTC.[104]  Second, Frosch argues alternatively that reformation is warranted based either on YTC's fraud or the parties' mutual mistake.[105]

### (1)   Whether YTC Is Bound Under the "Misnomer" Rule

"Under New York law, a contract entered into by a corporation under a 'colloquial title' is enforceable by either party, and 'the misnomer is held unimportant.'"  *Spanierman Gallery, PSP v. Love*, 320 F.Supp.2d 108, 111-12 (S.D.N.Y. 2004) (citing *Mail & Express Co. v. Parker Axles, Inc.*, 198 N.Y.S. 20, 21 (1923)); see also *Quebecor World (USA), Inc. v. Harsha Associates, L.L.C.*, 455 F.Supp.2d 236, 241-42 (W.D.N.Y. 2006) ("[T]he general rule is that '[w]here there is a misnomer of the corporation in the contract or obligation sued on, the corporation may sue or be sued, and recovery may be had by or against it, in its true and proper corporate name,'" citing *Walker v. Smith*, 257 F.Supp.2d 691, 698 (S.D.N.Y. 2003)); *In re D&B Construction of Westchester, Inc.*, 875 N.Y.S.2d 819, 2008 WL 4809405, *8 (N.Y. Sup. Ct. Nov. 3, 2008) (Unpub. Disp.) ("'[I]t has been long held that a corporation may be known by several names in the transaction of its business, and it may enforce and be bound by contracts entered into in an adopted name other than the regular name under which it was incorporated.'  In short, '[a] contract entered into by a corporation under an assumed name may be enforced by either of the parties.  If the entity of the corporation can be ascertained from the instrument itself, the misnomer is held unimportant; but, if not, evidence may be introduced . . . to establish what particular corporate entity was intended'" (citations omitted)); *Boisgerard v. New York Banking Co.*, 2 Sand. Ch. 23, 25 (1844) ("There is no doubt of the identity of the association described in this contract, and the misnomer therefore does not vitiate the transaction").

"Accordingly, absent an allegation that, at the time of the contract, a plaintiff was under an actual misapprehension that there was some other, unincorporated group with virtually the same name as that of the actual business entity, 'the Court will not permit the [parties] to capitalize on [a] technical naming error in contravention of the parties' evident intentions.'"  *Quebecor World (USA), Inc.*, 455 F.Supp.2d

---

[104]Opposition at 11-13.

[105]Complaint, ¶¶ 75-89.

at 242 (citing *Spanierman Gallery*, 320 F.Supp.2d at 112)).

Frosch argues that the naming of LLC in the contract was a mere "misnomer" and that there is no dispute YTC was the party intended to be bound.[106] Defendants counter that Frosch has not properly alleged that LLC was "a simple misidentification, . . . assumed name, or 'colloquial title,'" of YTC. They note that LLC's full name, as reflected in the Agreement, is "YTC Travel LLC," but that Frosch seeks to bind "Your Travel Center, Inc."[107] Defendants contend these "differences are far too substantial to be [denominated] a mere 'misnomer.'"[108] The court cannot agree. YTC's argument elevates form over substance and disregards the rationale underlying the "misnomer" rule.

As defendants note,[109] the misnomer rule is most frequently applied in situations where a plaintiff discovers that the entity defendant named as the party to a contract was mistakenly named under a "colloquial title" or trade name different than the legal name of the entity, and seeks to hold the individual officer who executed the contract on behalf of the corporation liable. See, e.g., *Quebecor World (USA), Inc.*, 455 F.Supp.2d at 242 (plaintiff sought to hold an individual defendant personally liable under a contract because he signed on behalf of "Harsha & Associates" rather than in the entity's true name, "Harsha Associates, LLC"); *Spanierman Gallery, PSP*, 320 F.Supp.2d at 112 (plaintiff sought to hold an individual defendant personally liable on a contract because he signed on behalf of "R.H. Love Galleries" rather than "R.H. Love Galleries, Inc."). Courts typically conclude that "[t]he use of a trade name, similar to [a business entity's] legal name will not replace corporate liability with personal liability on behalf of officers and directors," *Walker*, 257 F.Supp.2d at 698, because it would be inequitable to permit a plaintiff to "capitalize on [a] technical naming error in contravention of the parties' evident intentions," *Spanierman Gallery*, 320 F.Supp.2d at 112. This is particularly true where "the identity of the corporation is apparent." 7 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS, § 3014 (2014). The courts thus allow the suit to proceed against the intended entity rather than the

---

[106]Opposition at 11-13.

[107]Reply at 2-3.

[108]*Id.* at 3.

[109]*Id.* at 2-3.

individual.  The same rationale applies with equal force in the case at bar.

Here, there is little doubt as to the identity of the corporate entity that was the intended party to the contract.  As alleged in the complaint, in the five years preceding entry into the Agreement, Leibman maintained regular contact with Weatherhead, whom he knew to be YTC's president and CEO.[110] Leibman traveled to YTC's Arizona headquarters to meet with Weatherhead and YTC shareholders during the course of negotiations.[111]  While these negotiations and meetings were in progress, there was allegedly no confusion regarding the fact that any business relationship formed would be between Frosch and YTC.  Significantly, Frosch's allegations are supported by the terms of the Agreement.  It states that Frosch's counterparty has an office at 414 South Mill Avenue, Tempe, Arizona 85281,[112] and is an independent retail travel agency.[113]  It also states that Weatherhead is its CEO and Brenda Weatherhead, Robin [YTC's COO], Jacki [YTC's CFO], Chris [YTC's CIO], and Shane [YTC's implementation and training officer] are its senior management team.[114]  These statements describe YTC.

Where, as here, the identity of the corporation that was the intended party can be ascertained from the contract, the misnomer is "held unimportant," and the "contract . . . may be enforced by either of the parties."  *Mail & Express Co.*, 198 N.Y.S. at 21 ( "A contract entered into by a corporation under an assumed name may be enforced by either of the parties.  If the entity of the corporation can be ascertained from the instrument itself, the misnomer is held unimportant . . .").

Because it is clear, based on the terms of the Agreement, that YTC was the intended party, the court will not permit it to "capitalize on [a] technical naming error in contravention of the parties' evident intentions."  *Spanierman Gallery*, 320 F.Supp.2d at 112.  The court therefore concludes that Frosch has plausibly alleged that YTC can be held liable on the contract as written. See, e.g., *Quebecor*

---

[110]Complaint, ¶¶ 14-16.

[111]*Id.*, ¶ 22.

[112]Agreement at 1.

[113]*Id.*

[114]*Id.* at 5.

1   *World (USA), Inc.*, 455 F.Supp.2d at 242 ("Although Quebecor repeatedly argues that defendants have

2   failed to show that Harsha & Associates is the same entity as Harsha Associates, L.L.C., the fact remains

3   that neither the complaint nor plaintiff's other submissions contain any indication that Quebecor was

4   misled about the identity of the other party to the printing contract, or that the parties did not share a

5   mutual understanding in that respect.  I therefore see no basis for subjecting [the individual who signed

6   the contract] to personal liability based on the slight variance between the name on the contract and that

7   of the 'real' entity"); *Spanierman Gallery, PSP*, 320 F.Supp.2d at 112 ("Here, it is beyond dispute that

8   'R.H. Love Galleries' was intended to designate defendant R.H. Love Galleries, Inc.  Importantly,

9   Plaintiffs have not alleged that, at the time of the contract, they were under any actual misapprehension

10  that there was some other, unincorporated group with virtually the same name as R.H. Love Galleries,

11  Inc.  Absent such an allegation, the Court will not permit the Plaintiffs to capitalize on that technical

12  naming error in contravention of the parties' evident intentions"); *Assos Construction Corp. v. 1141*

13  *Realty LLC*, 993 N.Y.S.2d 23, 24 (N.Y. App. Div. 2014) ("Contrary to defendant project owner's

14  contention, the documents detailing the scope of steel work to be performed by plaintiff subcontractor

15  and setting a price for the work, are valid contracts that are binding on defendant.  The documents were

16  signed by defendant's manager, and a mere misnomer in the name of the corporate entity will not free

17  it from liability under the contract.  The contracts are sufficiently definite and evince an obligation on

18  the part of defendant to pay the price stated for the work.  This is not inconsistent with the contract

19  between defendant and the general contractor which specifically permitted defendant to contract directly

20  with other contractors"); *In re D&B Construction of Westchester, Inc.*, 2008 WL 4809405 at *8 ("In

21  short, '[a] contract entered into by a corporation under an assumed name may be enforced by either of

22  the parties.  If the entity of the corporation can be ascertained from the instrument itself, the misnomer

23  is held unimportant; but, if not, evidence may be introduced . . . to establish what particular corporate

24  entity was intended.'  Here, there is no doubt as to what corporate entity was intended.  Mitrione knew

25  that he was dealing with the D & B entity that was located at 1000 Main Street, New Rochelle, New

26  York.  Since the Construction Contract is the valid contract of D & B Westchester, it follows that it is

27  not the individual contract of Brescia").

28

    **(2)  Whether YTC Is Bound Because the Contract Should Be Reformed**

Alternatively, Frosch seeks reformation of the contract to name YTC.[115]  This claim is based on fraud and/or mutual mistake.[116]

    **(a)  Legal Standard Governing Reformation Under New York Law**

"[R]eformation is available in cases of fraud and mutual mistake."  *AMEX Assurance Co. v. Caripides*, 316 F.3d 154, 161 (2d Cir. 2003) (citing *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573 (1986); *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc.*, 46 N.Y.2d 211 (1978)).  See also *John Hancock Mutual Life Insurance Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 671 (2d Cir. 1983) ("Under New York law, a contract may be reformed if there is mutual mistake or a mistake by one party coupled with fraud or inequitable conduct of the other party," citing *Brandwein v. Provident Mutual Life Insurance Co.*, 3 N.Y.2d 491, 496 (1957)); *NGM Ins. Co. v. 52 Liberty*, No. 7:09-CV-09003, 2010 WL 6501383, *8 (S.D.N.Y. Dec. 6, 2010) ("Under New York law, reformation of a contract is warranted only in cases of mutual mistake – where the written agreement contradicts the intent of both parties – or in cases of fraud – where the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement").

"A claim for reformation of a written instrument must set forth '(1) an agreement other than that expressed in the instrument; (2) the written instrument sought to be reformed; and (3) mutual mistake of the parties, or the mistake of one party and the fraud of another.'"  *Citibank, N.A. v. Morgan Stanley & Co. International, PLC*, 724 F.Supp.2d 407, 415 (S.D.N.Y. 2010) (quoting *Linzer Products Corp. v. Sekar*, 499 F.Supp.2d 540, 549 (S.D.N.Y. 2007)).

"As used in the doctrine of mutual mistake, mistake means being in error in one's belief as to what the contract states."  *AMEX Assurance Co.*, 316 F.3d at 162 (internal quotation marks omitted)

---

[115]*Id.*, ¶¶ 75-89.

[116]*Id.*, ¶¶ 79-82, 83-89.

1   (citing RESTATEMENT (SECOND) OF CONTRACTS § 155).  "Reformation or rescission may be appropriate

2   where a writing does not set forth the actual agreement of the parties."  *Travelers Indem. Co. of Illinois*

3   *v. CDL Hotels USA, Inc.*, 322 F.Supp.2d 482, 495 (S.D.N.Y. 2004).  It is an appropriate remedy where

4   the wrong party is named in an agreement.  See *EGW Temporaries, Inc. v. RLI Ins. Co.*, 83 A.D.3d

5   1481, 1482 (holding that the lower court properly reformed a payment bond to reflect the intended

6   recipient, rather than the one incorrectly named on the bond).

7       "New York law . . . establishes a 'heavy presumption that a deliberately prepared and executed

8   written instrument manifests the true intention of the parties, and a correspondingly high order of

9   evidence is required to overcome that presumption.'"  *Barbagallo v. Marcum LLP*, 820 F.Supp.2d 429,

10  441 (2011) (quoting *Chimart Assocs.*, 66 N.Y.2d at 574).  Plaintiff must establish that reformation is

11  appropriate by "clear and convincing evidence."  *Id.*  See also *Lambert v. Lambert*, 142 A.D.2d 557

12  (N.Y. App. Div. 1988) (an agreement "cannot be reformed except upon clear and convincing proof of

13  mutual mistake, fraud in the inducement or unilateral mistake").  The Second Circuit has held that the

14  party seeking reformation must "show in no uncertain terms" not only that there was fraud or a mistake,

15  but also "exactly what was really agreed upon between the parties."  *Collins v. Harrison-Bode*, 303 F.3d

16  429, 435 (2d Cir. 2002) (internal quotations omitted).

17              **(b)       Whether Frosch Has Plausibly Alleged a Claim for**

18                         **Reformation**

19                  **(1)       Fraud**

20      Defendants do not move to dismiss Frosch's reformation claim to the extent it alleges fraud.

21  They focus solely on Frosch's allegations of mutual mistake.[117]  Because defendants do not challenge

22

23      [117]See Motion at 6 ("Nor is reformation warranted.  Frosch's counterparty as identified in the
    document is LLC, a non-existent company.  The Complaint alleges that this was simply an 'error' by

24  YTC COO.  Even if that were the case, Frosch took no steps to correct that 'error' in the month leading
    up to its execution of the document.  Frosch contends that inclusion of LLC 'was based upon a mutual

25  mistake of fact that is material and goes to the foundation of the agreement.'  If that is so, the proper
    remedy for a mutual mistake under these circumstances would be rescission"); Reply at 2 ("Frosch

26  cannot have it both ways, and its initial position was the more correct one: the designation of LLC, an
    entity which was never formed and does not exist, is 'material,' and does go 'to the foundation of the

27  agreement.'  Because (as Frosch has alleged) this designation resulted in a mutual mistake of fact,
    rescission is the proper remedy").

28

                                                    32

the sufficiency of Frosch's fraud allegations, they supply an adequate basis for pleading the claim, and defendants' motion to dismiss the claim must be denied. See, e.g., *Hull v. D&J Sports, Inc.*, No. C 03-05697 WHA, 2004 WL 1771572, *2-3 (N.D. Cal. Aug. 6, 2004) ("This order notes that defendant has not moved to dismiss under the theory of unlawful business practices. . . . Thus, plaintiffs are allowed to go forward with their Section 17200 claim under the . . . unlawful business practices theor[y]. Defendant's motion to dismiss the Section 17200 claim is DENIED").

### (2)   Mutual Mistake

"'In a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express the agreement.'" *Citibank, N.A.*, 724 F.Supp.2d at 415-16 (quoting *Chimart Assocs. v. Paul*, 498 N.Y.S.2d 344, 347 (1986)). Thus, "'[t]o plead a claim for mutual mistake, the factual allegations must establish that both contracting parties shared the same erroneous belief as to a material fact, and their acts do not in fact accomplish their mutual intent.'" *Id.* at 416 (quoting *FSP, Inc. v. Societe Generale*, No. 02CV4786 GBD, 2005 WL 475986, *15 (S.D.N.Y. Feb. 28, 2005)).

Frosch has adequately pled the first two elements of a reformation claim. It alleges that the parties agreed that Frosch would enter into the Agreement with YTC, but that the Agreement named LLC, rather than YTC, as a party.[118] It also plausibly pleads that both Frosch and YTC erroneously believed the party that would be named in the Agreement was YTC and that, as a result of Sanchez's error in completing the agreement, the Agreement erroneously listed LLC as the contracting party rather than YTC.[119] See, e.g., *Barbagallo v. Marcum LLP*, 820 F.Supp.2d 429, 440-41 (E.D.N.Y. 2011) ("Mutual mistake occurs where the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement, *such as when an inadvertent secretary's error fails to reflect the actual agreement of the parties*,'" citing *Harris v. Uhlendorf*, 24 N.Y.2d 463 (1969); *Hart v. Blabey*, 287 N.Y. 257, 262 (1942) ("Where there is no mistake about the agreement, and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it may occurred, may be corrected") (emphasis added)).

---

[118]See Complaint, ¶¶ 24-28, 30-31.

[119]*Id.*, ¶¶ 29, 77-82.

Frosch alleges that throughout the parties' negotiations, Leibman and Weatherhead discussed a business relationship between Frosch and YTC.[120]  In addition, Leibman purportedly traveled to YTC's Arizona office to meet with Weatherhead late in the negotiating process.[121]  Moreover, the Agreement lists the intended party's address as 414 South Mill Ave, Tempe, Arizona.[122]  This is YTC's address.[123]  Frosch alleges that it is aware of only one other YTC-related entity, but it is not licensed to do business in Arizona and does not have an office there.[124]  Finally, YTC allegedly terminated the Tzell Agreement immediately after Weatherhead signed the Frosch Agreement.[125]  If true, these allegations show an intention to bind YTC, and would be sufficient to establish that LLC was named as the result of a mutual mistake.  Indeed, in their motion to dismiss, defendants do not dispute the sufficiency of Frosch's allegations in this regard;[126] they merely argue that the proper remedy is rescission, not reformation.[127]  The court does not agree.

"Under New York law, while mutual mistake will justify rescission where the mistake exists at the time the contract is entered into and the mistake is substantial . . . it may not be invoked by a party to avoid the consequences of its own negligence."  *De Sole v. Knoedler Gallery, LLC*, 974 F.Supp.2d 274, 320 (S.D.N.Y. 2013) (internal quotation marks omitted) (citing *Da Silva v. Musso*, 53 N.Y.2d 543, 550 (1981)).  Frosch alleges that it was YTC's COO, Robin Sanchez, who filled in the identity of the

---

[120]*Id.*, ¶¶ 16, 21, 24-25.

[121]*Id.*, ¶ 22.

[122]*Id.*, ¶ 30.

[123]*Id.*, ¶ 31.

[124]*Id.*, ¶ 31, n.1.

[125]*Id.*, ¶ 50.

[126]See Motion at 6; Reply at 2.

[127]Motion at 6 ("Frosch contends that the inclusion of LLC 'was based upon a mutual mistake of fact that is material and goes to the foundation of the agreement.'  If that is so, the proper remedy for a mutual mistake under these circumstances would be rescission"); Reply at 2 ("Because (as Frosch has alleged) this designation resulted from a mutual mistake of fact, rescission is the proper remedy").

counterparty on the Frosch Agreement as LLC, not YTC.[128]  As COO, Sanchez should have known that LLC was a nonexistent entity and not the intended party.  Thus, YTC's own negligence precludes rescission, even if it were otherwise appropriate under the circumstances.  See *De Sole*, 974 F.Supp.2d at 320.  As a result, the court declines to dismiss the reformation claim to the extent it is based on mutual mistake.

**c.      Whether Weatherhead Is Bound by the Agreement**

Frosch asserts two distinct theories of liability against Weatherhead.  In the third cause of action, Frosch alleges that Weatherhead is personally liable for the purported breach of the Agreement because he guaranteed YTC's performance by signing the agreement, which contained a Guaranty and Indemnity paragraph.[129]  In the seventh claim, Frosch argues that Weatherhead is liable because he signed the agreement on behalf of LLC, an entity he knew did not exist.[130]

**(1)      Whether Weatherhead Is Personally Liable Because He Signed the Agreement**

Defendants argue that Frosch's third cause of action must be dismissed because Weatherhead never signed a separate guarantee.[131]  They also assert that he signed the Frosch Agreement on behalf of LLC, not in his individual capacity.[132]  As a consequence, they maintain, the contract cannot be enforced against him.[133]

The court notes first that, contrary to defendants' assertion, Frosch's third claim relies not on the unsigned guaranty as a basis for imposing liability, but rather on the Guaranty and Indemnity paragraph

---

[128]Complaint, ¶¶ 28-29.

[129]Complaint, ¶ 72; Opposition at 21.

[130]Complaint, ¶¶ 103-05.

[131]Motion at 9.

[132]*Id.*

[133]*Id.*

1    contained within the Agreement.[134]

2

3    ───────────────────

4    [134]*Id.* Although defendants do not directly make the argument in their motion, they appear to contend that the first clause of paragraph 5 merely qualifies the second clause, i.e., that it does not create

5    a contractual guaranty that is independent of the Guaranty attached as Exhibit A. To the extent defendants advance this argument, it raises issues of contract interpretation that cannot be decided at

6    this stage of the litigation. Although "[o]n a motion to dismiss, the [c]ourt may resolve issues of contract interpretation when the contract is properly before the court," "all ambiguities in the contract

7    [must be resolved] in [p]laintiff's favor." *Serdarevic v. Centex Homes, LLC*, 760 F.Supp.2d 322, 328-29 (S.D.N.Y. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002); *Banks*

8    *v. Corr. Services Corp.*, 475 F.Supp.2d 189, 195 (E.D.N.Y. 2007)). Thus, "[w]here a contract's

9    language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *Maniolos v. United States*, 741 F.Supp.2d 555, 567 (S.D.N.Y. 2010) (citing

10   *Advanced Marketing Group, Inc. v. Bus. Payment Systems, LLC*, 300 Fed. Appx. 48, 49 (2d Cir. Nov. 12, 2008) (Unpub. Disp.); *Rounds v. Beacon Assoc. Management Corp.*, No. 09 Civ. 6910, 2009 WL

11   4857622, *3 (S.D.N.Y. Dec. 14, 2009); *Wurtsbaugh v. Banc of America Sec. LLC*, No. 05 Civ. 6220, 2006 WL 1683416, *5 (S.D.N.Y. June 20, 2006)). "'[W]hen the language of a contract is ambiguous,

12   [however,] its construction presents a question of fact,' which of course precludes summary dismissal'" under Rule 12(b)(6). *Crowley v. VisionMaker, LLC*, 512 F.Supp.2d 144, 152 (S.D.N.Y. 2007); see also,

13   e.g., *Psenicska v. Twentieth Century Fox Film Corp.*, Nos. 07 Civ. 10972, 08 Civ. 1571, 08 Civ. 1828, 2008 WL 4185752, *4 (S.D.N.Y. Sept. 3, 2008) ("Where there are alternative, reasonable interpretations

14   of a contract term rendering it ambiguous, the issue should be submitted to the trier of fact and is not suitable for disposition on a motion to dismiss"); *Wurtsbaugh*, 2006 WL 1683416 at *5 ("Where a

15   contract term is ambiguous and material to the breach of contract claim, the claim may not be dismissed for failure to state a claim").

16

17         Here, it appears Frosch and defendants have competing interpretations of paragraph 5. After reviewing the relevant provisions of the Agreement, the court concludes the language could reasonably

18   be susceptible of either meaning. Consequently, the court declines to dismiss Frosch's third claim at this stage and instead construes the possible ambiguity in Frosch's favor. See *Maniolos*, 741 F.Supp.2d

19   at 567-68 ("'[W]hen the language of a contract is ambiguous, its construction presents a question of fact,' which of course precludes summary dismissal" on a Rule 12(b)(6) motion. . . . [A] contract is

20   ambiguous if it is reasonably susceptible to more than one meaning" (citations omitted)); see also *Serdarevic*, 760 F.Supp.2d at 333 ("To adopt Centex's interpretation that Centex had an absolute right

21   to terminate the Parcel 3 Agreement for any reason would make the phrase 'based upon the Feasibility Studies' meaningless. The phrase 'in the sole exercise of [Centex's] discretion' is not rendered

22   meaningless by the interpretation urged by Plaintiffs, because it guarantees to Centex that their interpretation or analysis of the Feasibility Studies could not be countermanded by Plaintiffs. *However,*

23   *the Court need not decide this issue as a matter of law. At the very least, these arguments demonstrate*

24   *that Plaintiffs' interpretation, even if not required, is a plausible interpretation of an ambiguous phrase.*

25   *On a motion to dismiss, all ambiguities must be resolved in Plaintiffs' favor.* Therefore, Centex's Motion to Dismiss the breach of contract theory supporting Count Three is denied," citing *Banks v.*

26   *Correctional Services Corp.*, 475 F.Supp.2d 189, 195 (E.D.N.Y. 2007)). It would be particularly inappropriate here to decide how the contract should be interpreted given that neither party has

27   specifically argued why the Agreement's guaranty provision is unambiguous, or why its interpretation

28   is the correct one and its opponent's is not reasonable.

1    "Under New York law, an agent who signs an agreement on behalf of a disclosed principal will

2    not be individually bound to the terms of the agreement 'unless there is clear and explicit evidence of

3    the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'"

4    *Lerner v. Amalgamated Clothing and Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991) (quoting

5    *Mencher v. Weiss*, 306 N.Y. 1, 4 (1953)).  "Applying this presumption, New York courts have found

6    individual liability only in rare cases."  *Id.*  See *Mason Tenders Dist. Council Welfare Fund v. Thomsen

7    Const. Co.*, 301 F.3d 50, 53-54 (2d Cir. 2002) (the "high degree of intention" required for a finding of

8    personal liability "goes beyond the mere presence of a personal liability clause in the signed

9    agreement").

10   In assessing the signatory's intention, court consider five factors: (1) the length of the contract;

11   (2) the location of the liability provision in relation to the signature line; (3) the presence of the

12   signatory's name in the agreement itself; (4) the nature of the negotiations leading to the contract; and

13   (5) the signatory's role in the corporation.  *Cement and Concrete Workers Dist. Council Welfare Fund,

14   Pension Fund, Legal Services Fund and Annuity Fund, v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994).

15   In addition to the five *Lollo* factors, "[t]he Second Circuit has also suggested examining the

16   structure and content of the signature lines to determine whether the agent intended to sign the contract

17   in his official capacity only."  *Consac Industries, Inc. v. LDZ Comercio Importacao E Exportacao

18   LTDA*, No. 01-CV-3857-ADS-ETB, 2002 WL 31094855, *3 (E.D.N.Y. Aug. 29, 2002) (citing *Lerner*,

19   938 F.2d at 5).  See also *TR 39th Street Land Corp. v. Salsa Distribution USA, LLC*, No. 11-CV-7193-

20   DF, 2013 WL 3090441, *6 (S.D.N.Y. June 18, 2013) (citing *Lerner* for the proposition that courts may

21   consider the signature line).  "[T]he New York Court of Appeals has observed that 'where individual

22   responsibility is demanded the nearly universal practice is that the officer signs twice – once as an

23   officer and again as an individual.'"  *Mason Tenders Dist. Council*, 301 F.3d at 54 (quoting *Salzman

24   Sign Co. v. Beck*, 10 N.Y.2d 63, 67 (1961)).  See also *Israel v. Chabra*, 537 F.3d 86, 97 (2d Cir. 2008)

25   ("The most obvious indicator of intent is the form of the signature")

26   Accepting the facts alleged in Frosch's complaint as true, only the first *Lollo* factor suggests that

27   Weatherhead intended to be held personally liable on the Frosch Agreement.  The contract is seven

28

pages long.[135]  Case law indicates that a contract of this length is brief and therefore weighs in favor of the imposition of personal liability.  Compare *Integrated Marketing and Promotional Solutions, Inc. v. JEC Nutrition, LLC*, No. 06-CV-5640-JFK, 2006 WL 3627753, *5 (S.D.N.Y. Dec. 12, 2006) (finding that a seven page contract, with some pages only half-filled with text, weighed in favor of individual liability); *Paribas Properties, Inc. v. Benson*, 146 A.D. 2d 522, 536 (N.Y. App. Div. 1989) (finding that a three page contract was not a trap for an unwary signatory (cited by *Lerner*)); *EQT Infrastructure Ltd. v. Smith*, 861 F.Supp.2d 220, 233 (S.D.N.Y. 2012) (finding that a three page contract weighed in favor of plaintiff in deciding a defendant's motion to dismiss) with *Mason Tenders Dist. Council Welfare Fund v. Van San Const. Corp.*, No. 01-CV-5195-RLC, 2004 WL 1746714, *3 (S.D.N.Y. Aug. 3, 2004) (finding that a twenty-four paged, single-spaced form contract and a 42 page single-spaced form contract weighed against a finding of personal liability*); Mason Tenders Dist. Council Welfare Fund v. Masucci*, No. 95-CV-9139-SHS, 1997 WL 334962, *2 (S.D.N.Y. June 17, 1997) (finding that a fifty-five page, single-spaced, form contract weighed against imposing personal liability).

Each of the remaining *Lollo* factors weigh against a finding of personal liability.  First, the Guaranty and Indemnity provision cited by Frosch is located on page three of the Agreement, while Weatherhead's signature is on page seven.[136]  Courts have found that even where the liability provision appears on the page directly preceding the signature, the second *Lollo* factor weighs against personal liability.  *Masucci*, 1997 WL 334962 at *2 (a liability provision located on the page before the signature page weighed against the imposition of liability).  Courts generally find that the second *Lollo* factor weighs in favor of personal liability only when the liability provision appears directly above the signature line.  See *Lollo*, 35 F.3d at 35 (holding that a liability provision located on the same page and immediately above the signature line weighed in favor of personal liability); *Mason Tenders Dist. Council of Greater New York v. Cheromin, Inc.*, No. 07-CV-1755-DAB, 2009 WL 1024256, *4 (S.D.N.Y. Apr. 13, 2009) (same); *Trustees of the Plumbers Local Union No. 1 Welfare Fund v. Philip General Construction*, No. 05-CV-1665-NG, 2007 WL 3124612, *7 (E.D.N.Y. Oct. 23, 2007) (same).

---

[135]Agreement.

[136]*Id.*, ¶ 5.

1  A liability provision that appears four pages before the signature page, therefore, strongly suggests that

2  personal liability should not be imposed.

3         The purported liability provision, moreover, is unclear.  The Guaranty and Indemnity provision

4  states:

5         "The individuals referred to as YTC in this agreement (and their spouses[)] shall

6         guarantee to FROSCH the performance of YTC's obligations under this Agreement and

7         the payment of sums required to be paid to ARC in connection with the issuance of ARC

8         Traffic Documents from the FROSCH branch, and shall execute personal guarantees, in

9         the form attached as Exhibit A.[137]

10 The provision is ambiguous in several respects.  First, it identifies the indemnitors as "the individuals

11 referred to as YTC in this agreement"; it does not mention Weatherhead by name.  The fact that the

12 reference is to "individuals" – plural – suggests that the intent was to impose liability not just on

13 Weatherhead but on other officers of YTC as well.[138]  Furthermore, in the same sentence, the provision

14 states that the individuals will execute personal guarantees.  It is thus unclear whether the Guaranty and

15 Indemnity provision, standing alone, is binding, or whether a separate personal guaranty must be

16 executed to trigger liability.  This ambiguity lends support to defendants' assertion that Weatherhead

17 is not liable because he did not sign a separate guaranty.  In short, the provision is not an "unequivocal"

18 imposition of liability of the type considered in *Lollo* and other cases.  *Lollo*, 35 F.3d 29 ("This

19 provision unequivocally fixes personal liability on the signatory").  Several courts have addressed the

20 effect of ambiguous personal liability provisions.  See *Trustees of the Plumbers Local Union*, 2007 WL

21 3124612 at *7-8 (evaluating the "explicitness of language purporting to create personal liability" and

22 finding that it weighed against the imposition of personal liability); *Lehman Bros., Inc. v. Tutelar CIA*

23 *Financiera, S.A.*, No. 95-CV-3772-DLC, 1997 WL 403463, *2-3 (S.D.N.Y. July 17, 1997) (noting that

24

25       [137]*Id.*

26       [138]Notwithstanding paragraph 5's reference to "[t]he individuals referred to as YTC in this
27 agreement (and their spouses)," the Agreement does not define "YTC."  (Agreement, ¶ 5.)  This creates
   a further ambiguity in paragraph 5 that the court declines to resolve in the context of this motion to
28 dismiss.

1    a contract was ambiguous and that this weighed against a finding of individual liability).  The court

2    draws further support for its conclusion that Weatherhead cannot be held personally liable on the

3    contract from the ambiguity of the Guaranty and Indemnity provision.

4            Returning to the *Lollo* factors, the third factor also weighs in Weatherhead's favor.  Although

5    Weatherhead is named in the agreement, his name appears in only two places – in the succession

6    provision and as the contact person for LLC.[139]  This is not persuasive evidence that Weatherhead

7    intended to be personally bound by the agreement.  *Turtle & Hughes, Inc. v. Browne*, No. 95-CV-9573-

8    SHS, 1996 WL 384895, *3 (S.D.N.Y. July 9, 1996) (the fact that the signatory's name was listed in a

9    section of the agreement captioned Principals and/or Officers "hardly constitutes" evidence of an intent

10   to be bound personally).  Furthermore, "the important question is not simply whether the signatory's

11   name appears anywhere in the body of the contract, but whether the name appears in the personal

12   guarantee clause itself." *Integrated Marketing*, 2006 WL 3627753 at *5 (citing *Turtle & Hughes*, 1996

13   WL 384895 at *3).  See also *Blake v. Fiit Intern., Inc.*, No. 05-CV-6150-HBP, 2007 WL 980362, *10

14   (S.D.N.Y. Mar. 30, 2007) (citing *Turtle & Hughes*).  Because Weatherhead is named only in provisions

15   that do concern his purported guaranty of the contract, this factor weighs against finding him personally

16   liable.

17           The fourth factor also weighs in Weatherhead's favor.  Frosch asserts that the negotiations that

18   culminated in the Frosch Agreement were conducted exclusively by Weatherhead and Leibman.[140]

19   Accepting this fact as true, it is unavailing.  In analyzing this factor, the court must consider not whether

20   the signatory was involved in negotiations generally, but whether the parties specifically negotiated the

21   purported personal liability term. *EQT Infrastructure Ltd.*, 861 F.Supp.2d at 229 (finding that the nature

22   of the negotiations factor weighed against imposing individual liability where the parties did not agree

23   to, or even discuss, individual liability during negotiations).  Frosch has not alleged any facts as to

24   whether there was negotiation of the Guaranty and Indemnity provision.  Therefore, this factor weighs

25   against a finding of personal liability.

26   _____

27           [139]*Id.*, ¶¶ 9, 11.

28           [140]Complaint, ¶ 28.  See also Complaint ¶¶ 15-16, 21-22, 24-25.

Furthermore, the structure of the signature line weighs against Frosch.  First, Weatherhead signed the agreement only once.  See *Jacobson v. Televida, Inc.*, No. 04CV163 (SLT)(MDG), 2005 WL 3609101, *5 (E.D.N.Y. Aug. 10, 2005) (a single signature weighs against finding the defendant personally liable); *EQT Infrastructure Ltd.*, 861 F.Supp.2d at 232 (same).  Furthermore, Weatherhead signed the contract on a line located between "YTC TRAVEL, LLC" and "By: Colin Weatherhead." This suggests he was signing solely in his representative capacity.  *Integrated Marketing*, 2006 WL 3627753 at *6 (finding that a signature after "By" weighed against the imposition of personal liability, and citing *Lerner*, 938 F.2d at 6).  Therefore, three *Lollo* factors weigh in Weatherhead's favor, as does the structure of the signature line.

Given its analysis of the relevant factors, the court concludes that Frosch has failed plausibly to allege facts showing that Weatherhead intended to be personally liable on the Frosch Agreement.  See *Mason Tenders Dist. Council Welfare Fund v. M.A. Angeliades, Inc*., No. 05 Civ. 8211(LBS), 2007 WL 4208587, *14 (S.D.N.Y. Nov. 20, 2007) (declining to impose personal liability despite the fact that four factors weighed in favor of doing so because parties did not negotiate or even discuss the personal liability provision).

### (2)    Whether Weatherhead Is Personally Liable Because He Signed on Behalf of a Non-Existent Corporation

Frosch's seventh cause of action alleges that Weatherhead is personally liable for breach of the Agreement because he signed the contract on behalf of a non-existent entity – LLC.[141]  Under New York law, an individual who signs a contract on behalf of a non-existent principal or entity is deemed to be personally liable on the contract for the obligations of the non-existent party.  See, e.g., *Ruso v. Morrison*, 695 F.Supp.2d 33, 51 (S.D.N.Y. 2010) ("When an individual executes a contract as an agent on behalf of a non-existent principal, the contract remains valid but is enforceable against the individual who claims to be an agent" (citation omitted)); *Metro Kitchenworks Sales, LLC v. Continental Cabinets, LLC*, 820 N.Y.S.2d 79, 80 (N.Y. App. Div. 2006) ("When individuals purporting to act on behalf of a non-existent principal enter into a contract with a third party, the contract does not for that reason alone

---

[141]See Complaint, ¶¶ 101-06.

41

become void or voidable at the whim of the third party.  Rather, under well-settled principles of agency law, the contract generally remains valid and enforceable as between the third party and the individuals who executed the contract on behalf of the non-existent principal.  As a general rule, '[l]iability is based on the rule that one who assumes to act as agent for a nonexistent principal is himself [or herself] liable on the contract in the absence of an agreement to the contrary and on the theory of a breach of an implied warranty of authority,'" citing *Bay Ridge Labor Co. v. Groenendaal*, 571 N.Y.S.2d 798, 799-800 (N.Y. App. Div. 1991); *Brandes Meat Corp. v. Cromer*, 537 N.Y.S.2d 177, 178 (N.Y. App. Div. 1989); *Puro Filter Corp. of America v. Trembley*, 41 N.Y.S.2d 472, 473 (N.Y. App. Div. 1943)); *Imero Fiorentino Associates, Inc. v. Green*, 447 N.Y.S.2d 942, 943 (N.Y. App. Div. 1982) ("Since the individual defendant admits that he signed on behalf of a non-existent principal, he is individually liable under the letter agreement" (citation omitted)).

Defendants' motion does not address this theory, nor does it explicitly seek dismissal of the seventh cause of action.  Defendants argue only that Weatherhead cannot be held personally liable because he never executed the guaranty attached as Exhibit A to the Agreement, an argument that is directed to Frosch's third and sixth causes of action.[142] Defendants address the theory only in passing in their reply:

> "Frosch argues that Weatherhead 'is personally liable to Frosch because he signed on
> behalf of non-existent LLC.'  But Frosch has not alleged that Weatherhead claimed to
> be an agent of LLC; rather, Frosch has alleged (correctly) that the designation of LLC
> was a mutual mistake of fact by the parties, and that YTC's COO (not Weatherhead)
> caused the error.  Accordingly, the principle Frosch cites is inapplicable."[143]

As a threshold matter, defendants' assertion that Frosch "has not alleged that Weatherhead claimed to be an agent of LLC" is plainly belied by Frosch's allegations.  Frosch pleads "[ ]on information and belief, [that] LLC is a nonexistent entity, and [that] Mr. Weatherhead knew that it was

---

[142]Motion at 9 ("Frosch asserts claims against Weatherhead in his individual capacity, alleging that he promised to guarantee YTC's performance.  As discussed *supra* at 5, Weatherhead never executed the Guarantee, and, as a result, it may not be enforced against him").

[143]Reply at 8 n. 9.

a nonexistent entity when he executed the FROSCH Agreement *on its behalf*."[144] Defendants also assert

that Frosch cannot hold Weatherhead liable on this basis because it also alleges that "the designation

of LLC was a mutual mistake of fact by the parties."  Defendants fail to appreciate that Frosch pled the

seventh cause of action *as an alternative* to the preceding claims.  The mere fact that Frosch alleges

multiple alternate theories of liability for breach of contract does not make its claims implausible.  Rule

8(d)(2) allows a party to "set out 2 or more statements of a claim or defense alternatively or

hypothetically, either in a single count or defense or in separate ones."  FED.R.CIV.PROC. 8(d)(2).  See

also *Anheuser-Busch Companies, LLC*, 2013 WL 3788426 at *2 ("Rule 8(d)(2) authorizes '[a] party [to]

state as many separate claims . . . as it has, regardless of consistency'" (citation omitted)).  That is what

Frosch has done here.  Because Frosch has alleged that Weatherhead executed the contract as LLC's

agent knowing that LLC was a non-existent entity, and because defendants do not otherwise challenge

the sufficiency of the allegations supporting the seventh cause of action, the court concludes that Frosch

has plausibly alleged that Weatherhead can be held personally liable for breach of contract.

Accordingly, the court declines to dismiss Frosch's seventh cause of action.

### 5.   Whether Frosch Has Sufficiently Alleged Damages

Finally, defendants assert that each of Frosch's breach of contract claims – i.e., the first, second,

third, fifth, sixth, and seventh causes of action – must be dismissed because Frosch has failed adequately

to allege damages.[145]  They assert that Frosch "alleges no real damages" – noting that "within several

days[146] of [ ] executing the supposed contract, defendants terminated it."[147]  Defendants assert it is

---

[144]Complaint, ¶ 103.

[145]Motion at 9.

[146]The complaint is ambiguous as to the time interval between the purported execution of the Agreement and defendants' alleged termination and breach.  Defendants' assertion that the contract was terminated "within several days" appears to be based on Frosch's allegation that Weatherhead emailed Leibman stating that "certain issues from both a legal and business perspective which have come to light over the past 48 hours" necessitated his termination of the contract. (Complaint, ¶ 54.)  The complaint, however, does not state when  Weatherhead sent the email nor does it attach the email as an exhibit.  While defendants' assertion may be a reasonable interpretation of the facts in the complaint, it is equally plausible that Weatherhead terminated the contract more than "several days" after execution of the Agreement.  One alternate interpretation, which would be reasonable based on the facts pled in the

1    "simply not believable" that Frosch suffered any compensable damages" when "[t]he only steps Frosch

2    alleges [that it took] in furtherance of the [A]greement consisted of alerting certain of its service

3    providers that YTC would ultimately begin reporting its sales through a Frosch ARC."[148]

4            In its complaint, Frosch asserts that YTC's failure to perform its obligations under the

5    Agreement has damaged it because it lost the ability to acquire YTC's business, lost the additional

6    commissions and overrides it would have earned had YTC reported sales through Frosch's ARC branch

7    office, lost the additional revenue it would have received had YTC reported hotel booksing through

8    Frosch's global distribution system, and lost the additional revenue it would have generated from

9    providing administrative support services to YTC.[149]   These allegations are plausible.   Frosch, for

10   example, alleges that commissions and overrides are calculated based on the volume of sales reported

11   through a particular agency's ARC branch office.[150]   Increased sales reported by YTC through Frosch's

12   ARC branch office would thus plausibly have resulted in increased commissions and overrides.   The

13   allegations of damages are also sufficiently specific at the pleadings stage.   See, e.g., *Comfort Inn*

14   *Oceanside v. Hertz Corp.*, No. 11-CV-1534 (JG) (JMA), 2011 WL 5238658, *8 (E.D.N.Y. Nov. 1,

15   2011) ("Comfort Inn alleges it suffered damages due to '(1) a lack of providing a company car . . . and

16   (2) loss of revenue due to lack of providing cars for hotel residents.'   It is plausible that the lack of a

17   company car would result in damages because Comfort Inn would have had to obtain alternate

18   transportation.   And it is also plausible that the lack of rental cars provided to Comfort Inn's guests

19

20   complaint, would be that defendants terminated the Agreement at least five days after it was executed.
21   This is so as it appears that the Agreement was executed on November 21, 2014 (see Agreement at 1),
     defendants notified Tzell that it was terminating the Tzell Agreement on November 24, 2014
22   (Complaint, ¶ 50 ("YTC notified Tzell that it was terminating the Tzell Agreement within 30 days (i.e.,
     by December 24, 2014)"), and for some period thereafter – likely for a period of at least two days –
23   Tzell's CEO, Liben, purportedly began to pressure and intimidate Weatherhead to continue YTC's
     relationship with his company.   (See *id.*, ¶¶ 53-54.)
24

25   [147]Motion at 9.

26   [148]*Id.*

27   [149]Complaint, ¶ 69.

28   [150]*Id.*, ¶¶ 19, 45.

would result in foregone commissions and dissatisfied customers. Although Comfort Inn's allegation does not fill in all the blanks as to how Hertz's alleged breach resulted in the damages it asserts, it adequately alleges damages resulting from Hertz's purported breach" (citation omitted)).[151]

Although defendants contend it is "not believable" that Frosch suffered these types of damage, that is a question of fact the court cannot resolve in the context of a motion to dismiss. The court thus concludes that Frosch has plausibly alleged damages supporting its breach of contract claims.

### 6.   Conclusion Regarding Frosch's Breach of Contract and Reformation Claims

For the reasons stated, the court concludes that, as alleged and for purposes of the pleadings stage, the Agreement does not lack material terms and is supported by sufficient consideration, that defendants YTC and Weatherhead can be bound, and that Frosch has sufficiently alleged damages resulting from the purported breach of the contract. Accordingly, Frosch has plausibly pled its first, second, and seventh causes of action for breach of contract. The court concludes, however, that Frosch has not plausibly pled the third cause of action seeking to hold Weatherhead personally liable on Frosch's purported contract with YTC. It must therefore be dismissed. Additionally, because the fifth and sixth causes of action allege entry into a contract with LLC, a nonexistent entity, and have been withdrawn by Frosch, these claims must be dismissed as well. Moreover, the court finds that, at this

---

[151]Frosch also alleges, in its claim for specific performance, that its reputation will suffer if YTC is not required to perform the contract because Frosch advised its longtime service providers to expect an increased volume of sales reported through Frosch's ARC that never occurred. (Complaint, ¶ 62.) While, as noted, this allegation is offered as support for Frosch's request that the court grant the equitable remedy of specific performance, allegations of reputational harm arising from a defendant's purported breach of contract are sufficient to survive a Rule 12(b)(6) motion to dismiss. See, e.g., *Samsung Display Co., Ltd. v. Acacia Research Corp.*, No. 14-CV-1353 (JPO), 2014 WL 6791603, *3 (S.D.N.Y. Dec. 3, 2014) ("Likewise, SDC has adequately pleaded damages. SDC has identified specific injury in the form of damage to its goodwill and reputation – and that is satisfactory on a motion to dismiss. The fact that SDC's damages are 'difficult to ascertain' does not strip its claim of plausibility" (citation omitted)); *Hard Rock Café International, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F.Supp.2d 552, 567 (S.D.N.Y. 2011) ("To state a claim for breach of contract under New York law, a plaintiff must allege damages. The Hard Rock Defendants allege that the purported breaches damaged their 'goodwill, standing, and reputation.' These allegations are sufficient to survive a motion to dismiss," citing *Smith McDonnell Stone & Co. v. Delicato Vineyards*, No. 94 Civ. 6474 (JFK), 1995 WL 375918, *4 (S.D.N.Y. June 22, 1995)).

stage in the litigation, Frosch has sufficiently alleged facts supporting reformation of the contract against YTC under both a fraud and mutual mistake theory in its fourth cause of action.

## III. CONCLUSION

For the reasons stated, defendants' motion to dismiss is granted in part and denied in part. The court grants defendants' motion to dismiss Frosch's fifth and sixth causes of action and dismisses those claims with prejudice. It also dismisses Frosch's third cause of action against Weatherhead with leave to amend. The court denies defendants' motion in all other respects. Frosch may file an amended complaint within twenty (20) days of the date of this order if it is able to remedy the deficiencies noted by the court herein.

Frosch may not plead new claims. Should the scope of any amendment exceed the scope of leave to amend granted by this order, the court will strike the offending portions of the pleading under Rule 12(f). See FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading"); see also *Barker v. Avila*, No. 2:09-cv-0001 GEB-JFM, 2010 WL 31701067, *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to a federal law claim where the court had granted leave to amend only state law claims).

DATED: June 26, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE